Harold L. PEEK, Jr., Petitioner,

v.

Dr. P. J. CICCONE, Director, United States Medical Center for Federal Prisoners, Springfield, Missouri, Respondent.

Civ. A. No. 16140-3.

United States District Court
W. D. Missouri, W. D.

Aug. 1, 1968.

Carl E. Yates, Springfield, Mo., for petitioner.

Calvin K. Hamilton, U. S. Atty., by Bruce C. Houdek, Kansas City, Mo., for respondent.

## MEMORANDUM AND ORDER DISMISSING PETITION FOR HABEAS CORPUS WITHOUT PREJUDICE

BECKER, Chief judge.

Petitioner, a federal convict confined in the United States Medical Center for Federal Prisoners, Springfield, Missouri, filed in this Court a petition for a writ of mandamus "for production of witnesses and documents to substantuate (sic) denial of due process of law and cruel and inhumane treatment with leave to proceed forma pauperis."

In the petition the petitioner states that he is a convict serving a "long sentence"; that his transfer to the federal prison at Leavenworth, Kansas, from McNeil Island and then to the Medical Center was "cruel and [in] humane treatment because it resulted in brutality and mental and physical suffering"; that he has been forced to take drugs which "muddle a man's mind preventing him from writing clearly to courts, politicians or relatives"; that various reports of his "stability" or "instability" which allegedly have been forwarded to the late Senator Robert F. Kennedy are prejudicial reports made by "prison officials"; that he is not allowed to see these reports and this is a denial of "legal representation"; that his work assignment at the Medical Center is "'forced slave labor' under the guise of 'rehabilitation'"; and that he has been brutally treated, confined in the "hole", a building where no "heat or too much heat is applied, small rations of water and a starvation diet, plus deprivation of hygiene facilities."

After considering petitioner's complaints, this Court determined that the nature of the petition was habeas corpus. The respondent was ordered to show cause why a writ of habeas corpus awarding injunctive relief should not be granted.

Respondent's response to the order to show cause states that on January 31, 1962, petitioner received a total sentence

of twenty-five years for violating Sections 2112 and 2114, Title 18, U.S.C.[1]; that his initial commitment was in the United States Penitentiary, McNeil Island, Washington, on February 2, 1962; that he was transferred to the United States Penitentiary, Leavenworth, Kansas, on December 5, 1965; that on March 24, 1966, petitioner was transferred to the Medical Center; that upon entering the Medical Center, "petitioner was housed in Ward 10A 2, which provides close individual custody for psychiatric patients"; that upon his entry to the Medical Center, he refused to accept a work assignment and on April 1, 1966, he "was placed in Ward 21E in a strip cell for discipline and maximum security"; that on April 2, 1966, he "refused to accept food and water and demanded that he be personally waited upon by custodial personnel"; that on April 9, 1966, because of petitioner's changed attitude, he was scheduled to be moved to Ward 10B where he would be allowed more freedom and comfort but that he refused oral medication which had been ordered for him and the custodial personnel were required to administer the medication intramuscularly and with force; and that petitioner was not injured, but one custodial officer was injured and, therefore, petitioner's scheduled transfer to Ward 10B was cancelled.

Respondent's response further stated the following:

"On April 12, 1966, petitioner was transferred to Ward 10B which is maximum control for acutely ill and chronic psychotics. Residents of this ward are kept in their rooms at all times except that exercise in the yard is provided on a regular basis with personal escort. On April 13, 1966, petitioner reported that he had passed out, fallen to the floor and cut his eye. This injury required one stitch to close. The injury to petitioner's eye which he complains of occurred in this manner, not at the time when medication was administered forcibly. On April 20, 1966, petitioner was moved to Ward 10D which again is a maximum control ward where the residents are housed in individual rooms. During the day the doors to these rooms are left open and the residents are allowed to go and come in the ward with some degree of freedom. Television is available. On May 11, 1966, petitioner was transferred to Ward 10F which is a ward for younger aggressive prisoners. This ward again provides individual rooms which are locked only at night and the residents are permitted to exercise in the yard, watch television, attend movies and have gymnasium privileges. At this time prisoner was assigned to work in the food service at the main kitchen. On May 19, 1966, petitioner refused to continue to work in food service and was reprimanded and warned but reassigned as an orderly in the craft shop, where he is currently assigned. On July 22, 1966, petitioner was removed from 10F and transferred to the regular prison population.

"The medication received by petitioner is as follows: April 6, 1966, 5 mg. Permitil, twice daily. This is a tranquilizing drug. As petitioner had refused this medication, Thorazine was administered in its place intramuscularly. April 23, 1966, the dosage was reduced to 4 mg.; April 29, 1966, reduced to 3 mg. and May 5, 1966, reduced to 2 mg. This medica-

---

1. The official files and records in this case show that after a jury trial, petitioner was sentenced by the United States District Court for the Western District of Washington, Southern Division; that he was charged with "robbery of federal funds" (18 U.S.C. 2112) in Count I and with "assault with a dangerous weapon and wounding in the commission of a robbery of money of the United States" (18 U.S.C. 2114) in Counts II and III; that he was found guilty on all three Counts of the indictment; that the sentence on Count I was 15 years; that the sentences on Counts II and III were each 25 years; and that all three sentences were to run concurrently and not consecutively.

tion was of a tranquilizing nature and was ordered by the medical staff of the institution for petitioner's benefit. It was reduced in strength in a continuing pattern and has been of substantial benefit to petitioner in that his psychiatric condition has improved to the degree where he has been recommended for transfer to a regular prison institution.

\* \* \* \* \* \*

"Petitioner next complains that he has been forced to slave labor by prison officials and that he has been punished for these refusals. The work program at the United States Medical Center is a necessary part of the discipline, treatment, care, rehabilitation and reformation provided by Section 4001, Title 18, United States Code. As petitioner is a convicted prisoner, he is not entitled to complain that he is required to do certain work.

\* \* \* \* \* \*

"Petitioner's complaint regarding brute force apparently refers to forcible administration of medication on April 9. 1966. The drugs involved were ordered by his assigned doctor and determined necessary for treatment of his condition. Petitioner was not injured and undue force was not used. One of the medical center personnel was, however, injured in this incident. Petitioner's eye injury apparently resulted from a fall and was not occasioned by acts of medical center personnel. Force is sometimes required to obtain compliance with Medical Center rules and regulations and to assure as much as possible the safety of other inmates, personnel and the public at large. All of the acts of the personnel at the United States Medical Center has been done in petitioner's best interests which is evidenced by his improved condition. The care provided is in line with the present day medical knowledge and penal administration. Undue force has not been used nor has the petitioner been mistreated in any way. It is respectfully submitted that all of the matters referred to by petitioner are within the sound administrative discretion of the Bureau of Prisons."

Petitioner's traverse of the response to the order to show cause entitled "Rebuttal Brief to the Opposition" stated that the administration of drugs by members of the Medical Center staff who were not "certified doctors" or "registered medical assistants" was unlawful and improper; that petitioner had not received a psychiatric hearing as provided by Section 4241, Title 18, U.S. C.; that his transfer to the Medical Center was unlawful because "prison officials" had misrepresented his "psychiatric record of illness"; that his confinement at the Medical Center prevented him from obtaining legal relief from custody; and that petitioner desired to have an injunction issue "to prevent coercive use of force \* \* \* for the purpose of forcing slavery in a prison job. \* \* \*"

After the filing of petitioner's traverse, this Court received a letter from petitioner on May 31, 1967, in which he complained of religious practices in the Medical Center, especially in connection with alleged refusals of his requests to change religious preferences. Petitioner requested that the Court "entertain this letter as a motion for an order, or injunction, to prevent further interference by Jackson Reed [Protestant Chaplain at the Medical Center] in my, or other inmates' freedom to choose a religion without all the stalling preventatives." This letter was treated as a supplement to the petition for habeas corpus filed herein.

After receipt of this letter, this Court considered the issues raised by the petition for habeas corpus, the response to the order to show cause, the traverse thereof, and the letter from petitioner stating interference with his religious freedom at the Medical Center. Thereafter this Court entered the following order: "Order Appointing Counsel, Granting Time For Respondent to File Response, And Granting An Evidentiary

Hearing." This order further requested that counsel meet and prepare a stipulation and statement of the issues in accordance with the procedures in the *Cortez* case. See 32 F.R.D. 391.

Respondent's supplemental response to the order to show cause was directed toward petitioner's complaints about interference with his religious freedom at the Medical Center. This response stated that religious practices at the Medical Center are governed by the "Policy Statement: Institutional Religious Program" issued by the Director of the Medical Center; that this policy "is reasonable under the circumstances and necessary to the orderly administration of that institution"; that an inmate of the Medical Center may change his religious preference while confined in the Medical Center only upon the Medical Center official receipt of acceptance "from an official of the group with which the inmate" desired to join; and that the religious practices policy of the Medical Center was being reasonably applied to the petitioner.

Pursuant to this Court's earlier order, the parties met and prepared the *Cortez* stipulation in which they set forth the following issues to be presented to this Court:

(a) Has the United States Bureau of Prisons, through its personnel, subjected petitioner to cruel and inhumane [unusual] treatment?

(b) Is the United States Attorney General's jurisdiction over petitioner valid?

(c) Is petitioner's confinement in the United States Medical Center for Federal Prisoners valid pursuant to the safeguards of Title 18, Section 4241 through 4248?

(d) Has petitioner been illegally required to submit to the administration of drugs and medicine by unlicensed personnel of the United States Medical Center for Federal Prisoners?

(e) Is petitioner unlawfully denied his constitutionally guaranteed right to religious belief by the personnel of the United States Medical Center for Federal Prisoners?

After counsels' filing of the agreed stipulation, this Court entered an order setting a plenary evidentiary hearing in this cause and requesting the respondent to cause petitioner to be produced at the hearing. Thereafter, on December 12, 1967, an evidentiary hearing was held at which petitioner appeared in person and by court-appointed counsel, witnesses were subpoenaed and testified, and petitioner testified himself.

*The Religious Freedom Questions*

During the course of the hearing, petitioner informed this Court that he had had a religious experience in which it was revealed to him that he was the reincarnation of Jesus Christ. Petitioner claims to have had this experience on February 5, 1962, while he was in prison at McNeil Island; that he underwent a "mind regeneration" from February 5, 1962, until November 27, 1965, when his own soul and the soul of the "Christos" (sic) began to operate through the same mind; and that this event was predicted or prophesied in 1917 by the revelations of the Virgin Mary to a group of children in Fatima, Portugal. The incident is reported in The Columbia Encyclopedia (3rd ed. 1963), p. 700, as follows:

"*Fatima*, hamlet, W. Portugal, near Leiria. At the nearby Cova da Iria is the national shrine of Our Lady of the Rosary of Fatima. This became a great Roman Catholic center of pilgrimage after the six reported apparitions of the Virgin Mary to three shepherd children, May 13-Oct. 13, 1917. The oldest of these children was named Lucia de Jesus Santos. An impressive basilica was built in 1944."

Petitioner claims that one or more of the Fatima revelations were never publicly disclosed but were kept secret and transferred in writing to the Pope

through the Bishop of Leiria. Petitioner testified that the secret of Fatima was revealed to him and, in substance, is as follows: that after two world wars and the rise of Russian communism, Christ or his "messenger of love" would appear on earth in the body of a thief and would bring world-wide peace. Petitioner further testified that he is a thief and the "Christos" (sic) referred to by the Virgin Mary in the secret prophecy of Fatima.

Petitioner contends that because he is the "messenger of love" referred to in the secret prophecy of Fatima, he is entitled to communicate his revelation and claims to the Pope for recognition of the fact that he has fulfilled the secret prophecy and is the spirit of Christ reincarnated. His beliefs are entertained in good faith. The respondent through his agents has refused to permit the petitioner to advise the Pope by direct mail of his claims and religious beliefs. No question of prison discipline or administration is involved. There is no evidence or reason to suppose that the Pope needs the protection of the Medical Center. Therefore, the petitioner should be allowed to communicate his religious experience and claims to the Pope. To forbid this is an invidiously discriminatory and arbitrary denial of religious freedom.

Petitioner further complains that the personnel of the Medical Center have interfered with his constitutionally guaranteed right to religious belief and practice. This complaint is based primarily on the Medical Center officials' refusal to allow the petitioner to attend Jewish religious services at the Medical Center. Petitioner is not a Jew by birth.

At the evidentiary hearing held in this cause, testimony was received from Reverend Jackson M. Reed, Protestant Chaplain and administrator of religious practices and activities at the Medical Center. Reverend Reed's testimony was that the petitioner did express to him a desire to attend the Jewish services at the Medical Center; that he informed the petitioner that he could attend the Jewish services only if his religious registration at the Medical Center stated that he was a member of the Jewish faith; that the religious preference registration which determines what religious services an inmate may attend occurs at the time the inmate is admitted to the Medical Center; that one could change his religious preference after being admitted to the Medical Center by communicating with and receiving acceptance by an official of the religious group with which he wished to affiliate; that he advised the petitioner that he should seek acceptance by the Jewish community by communicating his desire to join that faith to Rabbi Ernest I. Jacob who conducts the Jewish services at the Medical Center; that upon notice of acceptance by Rabbi Jacob, the petitioner would be allowed to attend the Jewish services; and that he did not ask Rabbi Jacob if the petitioner would be accepted by the Jewish congregation.

The testimony of Rabbi Jacob was that one who was not born a Jew could become affiliated with a Jewish congregation only if the Rabbi who presided over that congregation accepted him; that the traditional policy of the Jewish religion was to make it very difficult for one not born a Jew to qualify and be accepted for membership in a Jewish congregation; that the petitioner had never communicated with him about joining his congregation; that Mr. Carl E. Yates, Esquire, petitioner's court-appointed counsel, telephoned him and made inquiry about his acceptance of petitioner in his congregation; and that he told Mr. Yates that his personal policy was never to accept for membership in his congregation one who was a non-Jew and confined in a penal institution.

The evidence shows that petitioner's claims of belief in and desire to practice the tenets of the Jewish faith were not recognized by Rabbi Jacob. In this regard, it is noted that the Jewish community is not required under its religious doctrines to accept the petitioner for membership in their congregation.

The policy statement of the Medical Center covering the subject of "Institutional Religious Program"[2], in force at the time, stated, in part, the following:

"3. *PRINCIPLES*:

\* \* \* \* \* \*

"c. *Religious Meetings*:

\* \* \* \*

(2) Services and meetings conducted by recognized community clergy of a particular faith group shall be open for all patients to attend, with the approval of the officiating clergyman, regardless of the patient's religious affiliation. Patients from 10-C and 10-D will be permitted to attend these services when appropriate escort and supervision are available. The institution Chaplains will conduct meetings and services as posted. Particular faith groups presently meeting with community clergy are:

(a) Christian Science Group

(b) Jehovah's Witnesses Group

(c) Jewish Group

(d) Muslim Group

(3) Meetings and services conducted by patients will be limited to those persons indicating that particular faith group as their religious preference upon entering the Bureau of Prisons. Groups presently conducted by patient leaders are:

(a) Jehovah's Witnesses

(b) Jewish Group

(c) Muslim Group

(d) Yokefellows Group (Protestant)

Special passes from the appropriate Chaplain are required for attendance at the above meetings.

\* \* \* \*

"f. *Change of Religious Affiliation*: The religious preference listed upon entering the Bureau of Prisons is the official religious affiliation of the patient. Changes in religious affiliation can occur in relation to a particular community faith group. That is, the patient will meet the membership requirements of a particular faith group, and, upon receipt of notice of the patient's acceptance into membership from an official of that group, changes in the Central File Record will be initiated by the appropriate Chaplain."

While there are some serious constitutional questions concerning the validity of some parts of this policy, it is not unlawful as applied in this case to the refusal of the respondent to permit the petitioner to attend Jewish services.

 Although prisoners do lose some rights while confined in a penal institution, it is now well established that prisoners do have certain rights and privileges in the religious area which the federal courts will protect and that prison officials may not punish for or discriminate against religious beliefs as such. See, Annot. Provision of Religious Facilities for Prisoners, 12 A.L.R. 3rd 1276, l. c. 1278. It is also well established that certain religious practices of prisoners, as distinguished from their beliefs, may properly be the subject of administrative regulation and control. But particular religious groups may not be discriminated against and the action taken or regulations imposed by the

2. On June 18, 1968, the Director of the Medical Center for Federal Prisoners made effective new and revised regulations governing the institution's religious program. The new regulations are identified as Policy Statement H–7001.3A.

prison officials must not be arbitrary or unreasonable. Cf. Roberts v. Pegelow (C.A.4, 1963) 313 F.2d 548; Sostre v. McGinnis (C.A.2, 1964) 334 F.2d 906, cert. den. 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96; See, Annot., 12 A.L.R.3rd 1276, supra.

■■ The policies and regulations of the Medical Center governing religious practices are not arbitrary, discriminatory, or unreasonable. The policy for religious service attendance followed by the Medical Center does not restrict the freedom of those confined there to belief in the religion of their choice, but it does limit those who may attend the services of certain religious faiths. It is easy to imagine circumstances where this limitation would be unreasonably discriminatory and unlawful but this is not such a case.

To the extent that the policy is relevant to and desirable or necessary to proper prison administration or discipline, it is a lawful exercise of discretion. Cf. Douglas v. Sigler (C.A.8, 1967) 386 F.2d 684. In this case, the petitioner failed to meet the burden of proving that he is a Jew by birth or by choice. His claimed eligibility was based on his belief that in his body ("the body of a thief") Christ, a Jew, has reappeared on earth. Therefore, the refusal of the Medical Center authorities to allow petitioner to attend Jewish religious services at the Medical Center because he had failed to obtain acceptance or permission to attend those services by the Rabbi conducting those services is not a violation of his constitutionally protected right to freedom of religion.

*The Cruel and Unusual Punishment Questions*

■ During the course of the hearing at which testimony was received on the issues of whether or not petitioner had been subjected to cruel and unusual punishment by prison officials and to the administration of drugs by unlicensed personnel while confined in the Medical Center, it became clear that petitioner was not being subjected to invidiously discriminatory or cruel and unusual punishment at the time of the filing of the petition herein or thereafter, nor was there a probability that petitioner would be subjected to such punishment.

Officer Brinkley testified that he had been employed by the Bureau of Prisons for 19 years; that he recalled one occasion when petitioner refused a request to take oral medication prescribed and ordered by a doctor; that he may have told the petitioner that the medication would be administered by force if necessary; that force was used to administer the medication, but that he did not give the petitioner the injection; that he and three other officers helped to hold the petitioner while officer Robert Randolph administered the injection; and that he suffered injuries to his nose while struggling to hold petitioner so that the injection could be given.

Officer Randolph testified that on April 9, 1966, after petitioner refused to take the oral medication, he administered 50 milligrams of Thorazine (a tranquilizer) to the petitioner intramuscularly; that he was not a doctor or a registered nurse; that he is not a registered pharmacist but although not an expert, he has had medical training and experience in administering intramuscular injections while employed at the Medical Center; that Dr. Walinsky of the Medical Center had ordered the injection of 50 milligrams of Thorazine if petitioner refused the oral medication; that the oral medication (Permitil) is received from the ward supervisor in small cups showing the person's name and number who is to receive it; that the drug Thorazine might cause one not accustomed to it to become dizzy; that force was used to give the petitioner the injection of Thorazine; that he did not know of any unnecessary force used to administer the injection to the petitioner and that there was no indication that petitioner was injured; and that the day after force was used to administer the Thorazine to petitioner, petitioner apologized and thereafter accepted the oral medication without incident.

Dr. Louis Moreau, M.D., Deputy Chief of Psychiatry at the Medical Center, testified that the medical history of petitioner received at the Medical Center from Leavenworth Penitentiary indicated that petitioner suffered from chronic schizophrenia; that he interviewed and examined petitioner when admitted to the Medical Center to determine his ward and job assignment; that petitioner had not been certified as psychotic at the time of entering the Medical Center and had not been certified psychotic since his arrival at the Medical Center; that petitioner was assigned to ward 21E for refusing to accept his work assignment; that both the oral and injected types of medication prescribed for the petitioner were tranquilizers administered to reduce the petitioner's anxiety and hostility; that they are non-narcotic and not habit forming; that the medication prescribed for petitioner was ordered by Doctor Walinsky; that the dosage prescribed for the petitioner was a reasonable dosage; that the treatment of petitioner was reasonable and ordinary; that petitioner improved after receiving the treatment; that force may be used to administer medication only as a last resort; and that he was not aware of the use of force to administer Thorazine to the petitioner on April 9, 1966.

Petitioner testified that when he was admitted to the Medical Center he was assigned to work in the kitchen; that he refused to accept this assignment because he had a weight problem; that Dr. Moreau examined him and talked to him about this problem; that because of refusing to accept this work assignment, he was isolated from the Medical Center population and given drugs; that he requested an assignment to the craft shop so that he could rehabilitate himself; that he later was assigned to the craft shop and is presently working there; that the drugs he received at the Medical Center made him dizzy and on occasion have caused him to faint; and that once he fainted and injured himself.

After hearing the testimony on the issue of whether petitioner had been treated cruelly, unusually, or otherwise unlawfully by the officials of the Medical Center, it is found that he has not been so treated. The officers of the Medical Center (subordinates of the Attorney General) were not attempting to punish or harm the petitioner by forcibly administering under medical direction the intramuscular injection of Thorazine to petitioner on April 9, 1966. Petitioner was physically restrained by the prison officials only after he refused the oral medication and had been advised that he would be given the medication by injection if he did not consent to taking it orally. Under these circumstances, it cannot be said that petitioner was subjected to cruel or unusual treatment within the prohibition of the Eighth Amendment, nor was he treated in an invidiously discriminatory manner by such administration of medication.

Petitioner's contention that he was illegally required to submit to the administration of drugs and medicine by unlicensed personnel of the Medical Center is also without merit. Officer Randolph and Dr. Moreau both testified that Dr. Walinsky, a competent medical practitioner, had prescribed the medication and the dosage to be given. The medication was properly prepared by a competent person other than the one administering the medicine or drug. Further, officer Randolph as a result of his training is shown by the evidence to be competent to give intramuscular injections. Therefore, these acts, based on Dr. Walinsky's orders, are not within the prohibitions of the Eighth Amendment or otherwise unlawful.

*The Question of Confinement at the Medical Center*

■ Petitioner also challenges the jurisdiction of the Attorney General and the Bureau of Prisons' action in transferring him to the Medical Center without a sanity hearing pursuant to Section 4241, Title 18, U.S.C. While that section provides for the transfer of a pris-

oner to the Medical Center, it is not the exclusive statutory provision authorizing such transfer. Section 4241 and related sections go far beyond the bare transfer of the prisoner to the Medical Center since those sections provide for retaining the prisoner for his full term without deduction for good time or commutation of sentence and for retention of the prisoner after expiration of his full term if it is found that his release would be dangerous to society. Jones v. Harris (C.A.8, 1964) 339 F.2d 585. See Sections 4247, 4248, Title 18, U.S.C.

■ The federal court which sentenced the petitioner committed him to the custody of the Attorney General of the United States who is responsible for the care, custody, and control of the petitioner in accordance with law. Under such a commitment, Congress has delegated to the Attorney General and the prison authorities, not to the courts, the power, duty, and discretion to determine whether a federal prisoner in custody pursuant to a valid sentence should be confined in the Medical Center, and of determining what sort of medical care and treatment he needs. In re Baptista's Petition (W.D.Mo., 1962) 206 F. Supp. 288; and Section 4082, Title 18, U.S.C.

■ There may be, however, rare and exceptional circumstances in which a court will undertake to restrain the abuse of discretion of the Attorney General to prescribe conditions of a prisoner's otherwise lawful confinement. Harris v. Settle (C.A.8, 1963) 322 F.2d 908. However, it does not appear that this case is one where the Attorney General abused his discretion.

■ In this case, petitioner makes no attack upon the validity of his conviction and sentence. Petitioner's complaint is that he cannot be required to serve his sentence at the Medical Center since he has not been certified insane. This contention is without merit. As discussed earlier herein, Section 4082, Title 18, U.S.C., gives the authority and responsibility "to classify federal prisoners for the purposes of confinement, care and treatment" exclusively to the Attorney General "and that his determinations, made in the exercise of that authority, are not subject to review in habeas corpus proceedings." Garcia v. Steele (C.A.8, 1951) 193 F.2d 276, 278. Therefore, petitioner is lawfully confined in the Medical Center pursuant to the lawful exercise of the discretion of the Attorney General.

For the foregoing reasons, it is hereby

Ordered that petitioner be, and he is hereby, granted leave to proceed in forma pauperis. It is further

Ordered that the petition for a writ of federal habeas corpus herein be, and it is hereby, dismissed without prejudice. It is further

Ordered that the respondent be enjoined from refusing to mail a respectful letter from petitioner to the Pope setting forth his claims and beliefs in connection with the alleged fulfillment of the unrevealed prophecies of Fatima.