463 F.2d 109
 Perley WILSON, Appellant,
v.
Arthur T. PRASSE, Commissioner of Correction, Commonwealth
of Pennsylvania, Harrisburg, Pennsylvania, et al. (Joseph R.
Brierley, Superintendent, Additional Defendant) dismissed
8-11-69 and Allyn Sielaff, Commissioner of Correction for
the Commonwealth of Pennsylvania (Added by Order of 10/28/70).
 No. 71-1684.
 United States Court of Appeals,
 Third Circuit.
 Argued May 25, 1972.
Decided June 22, 1972.
 
 Mark A. Senick, R. Stanton Wettick, Jr., Neighborhood Legal Services, Pittsburgh, Pa., for appellant.
 George R. Specter, Pittsburgh, Pa., for appellee.
 Before STALEY, ALDISERT and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 This appeal from a judgment for defendants entered upon a jury verdict raises questions of alleged error during the course of a trial for money damages brought by a state prisoner under 42 U. S.C. Sec. 1983. Trial was held following remand by us, Wilson v. Prasse, 404 F. 2d 1380 (3d Cir. 1968), for the purpose of ascertaining whether defendants deprived appellant of his rights under the Free Exercise Clause of the First Amendment, made applicable to the states by the Fourteenth Amendment. Appellant is a member of the Muslim faith, was a state prisoner at the time of these proceedings and is now on parole.
 
 I.
 
 2
 We address ourselves initially to appellant's contention that in delivering its jury instructions the court erred in its definition of the proper test for measuring the validity of prison rules and regulations governing the practice of the Muslim religion by appellant and other inmates. Specifically, appellant urges that the reasonableness test, as utilized by the court, was improper, and that examination of these regulations by the proper standard would have resulted in a directed verdict for plaintiff.
 
 
 3
 Appellant introduced evidence that inmates at Pennsylvania's Western Penitentiary could be visited by and correspond with Catholic priests, Protestant ministers, and Jewish rabbis of their choice, but that restrictions were imposed as to visits by and correspondence with Muslim ministers.[1] Defendants agreed that Catholic, Protestant, and Jewish religious services were held and, indeed, were conducted at state expense,[2] but submitted testimony that prison authorities had attempted to comply with the practice ordered by the Eastern District of Pennsylvania in Knuckles v. Prasse, 302 F.Supp. 1036, 1062 (E.D. Pa.1969), and affirmed by us, 435 F.2d 1255 (3d Cir. 1970): Muslim inmates in Pennsylvania prisons are entitled to have visits by Minister Jeremiah Shabazz and other accredited ministers "so long as the doctrines espoused by the ministers are identical to those Minister Shabazz testified to during the court proceedings." Defendants introduced testimony that although requested, Minister Shabazz never came forward with a list of accredited Muslim ministers. Superintendent Brierley also testified that the attorney general wrote to the Honorable Elijah Muhammad, the recognized head of the Muslim religion, for information concerning the availability of a minister to act as chaplain for the Black Muslim inmates and received no reply. There was also testimony that the prison chapel was available for Muslim use, and that religious services for Muslims had been conducted by a lay Muslim minister, but the Muslim inmates raised objections to the presence of religious articles representative of other religions and to the presence of prison guards during their services.[3]
 
 
 4
 Appellant introduced testimony that although inmates may regularly order, receive, and possess Bibles and other religious literature, including religious newspapers, prison rules and regulations prevent inmates from ordering, receiving, or possessing Muslim literature, including that version of the Koran (also known as Qur'an) approved by Honorable Elijah Muhammad, and certain other publications, viz., The Supreme Wisdom, How to Eat to Live, Message to the Black Man, and Muhammad Speaks. Defendants elicited testimony that approved copies of the Koran[4] were available at the institution, as were other publications plaintiff claimed were denied him.[5]
 
 
 5
 The question of the distribution of Muslim literature among prison populations is not free from difficulty. The writings and teachings of the Honorable Elijah Muhammad have been described as capable of two interpretations by rational persons: first, "as an endorsement of a concept of intense hatred for all whites, who are referred to as 'devils.' Further, these writings and teachings could be interpreted as an endorsement of a concept that whites generally and prison and government authorities should be defied by Muslim prisoners even when legal orders or demands are made." Knuckles v. Prasse, supra, 302 F.Supp. at 1050, Higginbotham, J. "From another perspective, a rational person could interpret [these writings] as merely a partisan historical analysis of this nation's shameful history of slavery and a condemnation of racial discrimination, past and present, in the United States and other Anglo-Saxon nations." Ibid, 302 F.Supp. 1050-1051. Accordingly, Judge Higginbotham ruled, and his ruling was explicitly affirmed by this court: "Since the literature could be subject to inferences urging such defiance if not properly interpreted by a trained Muslim minister, I rule that it is not mandatory that the prison authorities make available to prisoners the writings. In the hands of the inmate who is not fully informed of the Black Muslim doctrine, as Minister Shabazz purports it to be--under such circumstances the literature could constitute a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution." Ibid, 302 F.Supp. at 1059.[6]
 
 
 6
 Additionally, there was evidence that Muslim dietary laws precluded the use of pork, and because the regular prison fare included this meat, plaintiff was denied a proper and adequate diet. Countering this, the institution's steward testified that the prison diet was such that if plaintiff chose foods which contained neither pork nor the essence thereof, he could still obtain a satisfactory diet.
 
 
 7
 Following the reception of this evidence, the court charged, in part:
 
 
 8
 Now, it appears in this case that plaintiff is a prisoner duly incarcerated in a state correctional institution. Now, this very fact means that he is deprived of his liberty to a great extent. This is why he was sent there. In such a case the prison authorities have the right to make reasonable rules and regulations for the operation of the prison, and they have wide discretion in the matters of prison operation and discipline.
 
 
 9
 The subject of reasonable maintenance of discipline in a state institution like this is not subject to the supervision of a federal court, whether a judge or jury or combined. On the other hand, plaintiff is entitled to the free exercise of his religion as long as it does not interfere with the reasonable rules and regulations of the institution. The prison officials need not have special rules and regulations tailored to meet the needs of every group in the prison.
 
 
 10
 Further, while they should impose no unreasonable barriers, that is, unreasonable under the circumstances of the particular case, to the free exercise of an inmate's religion, they are not under duty to supply every inmate with a clergyman or religious services of his choice.
 
 
 11
 The question which will be before you to decide is whether the rules and regulations of this institution, as applied to this plaintiff, were unreasonable and unjustified with respect to the needs of prison restraints and discipline.
 
 
 12
 While prison officials have wide discretion in the maintenance of discipline, they are not entitled to punish or harass anyone because of his race or religious beliefs.On the other hand, plaintiff is not entitled to the full exercise of his religion to the extent that the same might be injurious to the rights of others. . . .
 
 
 13
 Also, if in the sound judgment of prison authorities certain correspondence and publications would be considered inflammatory and subversive of prison discipline under the circumstances existing in this institution, and the prison authorities are not motivated by religious or racial prejudice, they can exclude such publications and correspondence.
 
 
 14
 However, to justify the prohibition of religious literature and the practices of a religion, prison officials must prove that the literature creates a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution.
 
 
 15
 Wilson v. Prasse, 325 F.Supp. 9, 12-13 (W.D.Pa.1971).
 
 
 16
 Appellant's major complaint is that in submitting the question of the prison rules and regulations as applied to the appellant, the jury was to consider whether they were "unreasonable and unjustified with respect to the needs of prison restraints and discipline."
 
 
 17
 We hold that the instructions given by the district court comported precisely with the standards set forth as the appropriate law of this circuit. We have previously explained that not all federal constitutional rights follow an inmate into prison:
 
 
 18
 Stated simply, a man in jail is not a free man; the denial of his right to drink fully from the cup of freedom is the very hypostasis of confinement. . . .
 
 
 19
 . . . [The objective of incarceration] is to circumscribe certain activities and opportunities not only available in, but also characteristic of, an open societal setting. And, unpleasant as it is to contemplate the physical restrictions of a "settled environment", we must also recognize that even those rights which survive penal confinement may be diluted by peculiar institutional requirements of discipline, safety, and security.
 
 
 20
 To determine, with precision, those rights which follow an inmate into prison involves a process of weighing and balancing conflicting interests. The desire that there be a maximum opportunity for the exercise of rights and privileges may often collide with the practical necessities of managing and administering a complicated penal community. The task of striking the proper balance between these conflicting interests is generally within the competence of the prison authorities. Thus, the federal courts have been understandably reluctant to intervene in matters of state prison administration, recognizing that a wide latitude for judgment and discretion must be extended to prison officials.
 
 
 21
 At the same time, however, the federal courts have been sensitive to certain particularized complaints, foremost among which have been allegations of religious discrimination. In such cases, the courts have not hesitated to intervene where prison officials have unreasonably attempted to curtail the practice of religion by prison inmates. See Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed. 2d 1030 (1964); Walker v. Blackwell, 360 F.2d 66 (5 Cir. 1966); Pierce v. LaVallee, 293 F.2d 233 (2 Cir. 1961). Usually the cases have involved a denial of the use of available services or facilities or materials. But the test of what actions are unreasonable restraints on the exercise of religion has of necessity proceeded on an ad hoc basis. . . .
 
 
 22
 Gittlemacker v. Prasse, supra, 428 F.2d at 3-4.
 
 
 23
 In Gittlemacker, we explicitly referred to the test as: "The requirement that a state interpose no unreasonable barrier to the free exercise of an inmate's religion," 428 F.2d at 4, and in so doing we were adhering to the test set forth in Long v. Parker, 390 F.2d 816, 820 (3d Cir. 1968): "Where . . . the charge is made that the regulations imposed by prison authorities restricting religious practices fall more harshly on adherents of one faith than another, the courts will scrutinize the reasonableness of such regulations."
 
 
 24
 Appellant's reliance on United States of America ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971), is misplaced. Aside from the basic difference in the cases that Jones dealt with summary judgment and not with a jury instruction, the precise holding there comported exactly with the Gittlemacker-Long test: "This, however, does not mean that a prisoner's right to practice his religion is absolute. Such right may be reasonably restricted in order to facilitate the maintenance of proper discipline in prison." 453 F.2d at 149. In reversing the grant of summary judgment, we held there was a sufficient allegation that "prison regulations are overbroad and that the evidence will show that they were not reasonably related to the maintenance of proper order in the prison, or that they were unreasonably applied to him." 453 F.2d at 150.
 
 
 25
 In assigning error to these instructions, appellant launches a scattered attack and fails precisely to indicate what the instructions should have been. Appellant attacks the "unreasonable and unjustified" test by arguing that "such regulations are valid only if the State is able to show a substantial interest requiring the imposition of such regulations." Later, he contends that "the legality of such regulations becomes a jury question only if sufficient evidence is presented which, if believed, would establish a compelling need." Accepting, without conceding, the validity of these arguments, it becomes apparent that "substantial interest" or "compelling need" are, in the context submitted by appellant, solely standards of law, for use by the court to determine preliminarily before the reasonableness issue is submitted to the jury. Moreover, even if these expressions were to be construed as appropriate guidance for the jury, no such instructions were requested in plaintiff's points for charge,[7] or in the colloquy between court and counsel following the instructions. Given the history of the Black Muslim religion, see, e. g., Long v. Parker, supra, 390 F. 2d at 819-820, n. 14, the problems associated with the teachings of the Honorable Elijah Muhammad delineated in Knuckles v. Prasse, supra, and the testimony at this trial by Superintendent Brierley "that there had been trouble in the past with the Black Muslims and that some of the literature sent in to the prison for them was inflammatory," Wilson v. Prasse, 325 F.Supp. 9, 14 (W.D. Pa.1971), we are satisfied that the requisite circumstances were present to submit the issue of the reasonableness of the regulations to the jury.
 
 
 26
 After the court charged the jury, appellant's counsel stated: "I contend that the standards throughout should not be whether it is unreasonable but whether it constitutes a clear and present danger." Although the clear and present danger test was not improperly applied to religious literature, note 6, supra, and Long, supra, such an instruction as to all prison rules and regulations would have been gross error.[8]
 
 
 27
 Accordingly, we hold that appellant was not entitled to a directed verdict in his favor. Given the evidence presented in these proceedings, the issue of the reasonableness of the regulations was a jury question. We find that the district court instructed the jury fairly and accurately, and properly denied appellant's requested instruction that the prison rules and regulations as promulgated generally and as applied to appellant, as a matter of law, constituted illegal conduct as deprivation of the Free Exercise Clause.[9]
 
 II.
 
 28
 Appellant next contends that the court erred in refusing to grant a mistrial as a result of defense counsel's statement to the jury that any money damages awarded would be paid by defendants "out of their own pockets." He applies the analogy of reference to insurance coverage in a classic tort case. Defendants respond that the factual analogy is not proper where the defendants were sued not as individuals but as "Commissioner of Correction, Commonwealth of Pennsylvania, Harrisburg Pennsylvania; Superintendent, State Correctional Institution at Pittsburgh; and Deputy Superintendent, State Correctional Institution at Pittsburgh; and Commissioner of Corrections, Commonwealth of Pennsylvania," thus possibly giving rise to the inference that the state would be responsible for any damages awarded. We are persuaded that the district court's treatment of this issue was proper and that no prejudicial error emanated therefrom.[10]III.
 
 
 29
 Appellant's final contention is that he is entitled to a new trial because the general verdict was inconsistent with the jury's failure to answer certain interrogatories.[11] At the time the questions were submitted, the court explained to the jury: "[W]e are faced in this suit also with a request for an injunction to restrain further acts of this kind, and your answers to these questions will be of great assistance in guiding the court as to what to do about that request." In its post-trial opinion the court explained: "The court determined that the prayer for injunctive relief would be dealt with by the court following submission of the issues to the jury for an advisory verdict under Rule 39(c) of the Rules of Civil Procedure. To assist the court in determining disposition of the prayer for injunction, six special interrogatories were presented to the jury." 325 F.Supp. at 11. Prior to any instruction concerning the interrogatories, the jury was instructed that they were required to return a general verdict, and the court gave detailed instructions on how this should have been returned. We agree that there was no inconsistency between the completed general verdict and the incomplete special interrogatories. Moreover, we agree that with respect to the interrogatories, the jury was sitting as an advisory jury. F.R.Civ.P. 39(c). Because findings by an advisory jury are not binding, for the ultimate responsibility for finding the facts remains with the court, Wright, Federal Courts, Sec. 92 at 409; Greenwood v. Greenwood, 234 F.2d 276, 278 (3d Cir. 1956), a failure to answer all the requests is not fatal to the proceeding. See, The Frostie Company v. Dr. Pepper Company, 361 F.2d 124, 126 (5th Cir. 1966).[12]
 
 
 30
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 Appellant also introduced evidence that prison regulations prohibited inmates from holding or attending Muslim religious services. Moreover, there was testimony that although prison rules and regulations permit inmates to wear religious medals symbolic of the Protestant, Catholic, and Jewish faiths, inmates are prohibited from wearing religious medals symbolic of the Muslim faith because religious medals "are not to be of a size larger than a quarter."
 
 
 [2]
 No Establishment Clause issue has been raised in these proceedings. See Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970): "[To] . . . suggest that the Free Exercise Clause demands that the state not only furnish the opportunity to practice, but also supply the clergyman, is a concept that dangerously approaches the jealously guarded frontiers of the Establishment Clause."
 
 
 [3]
 Prison authorities will of course have the right to be present and to monitor these [Muslim] collective worship services in the same manner as they may monitor any other religious services
 Knuckles v. Prasse, supra, 302 F.Supp. at 1058 (emphasis in original).
 
 
 [4]
 The Holy Qur'an is the central book of the Muslim religion and contains its basic teachings and principles. The followers of the Honorable Elijah Muhammad prefer the edition of the Holy Qur'an which contains both the Arabic and English language versions of the text. Prior to October 18, 1969, Black Muslims in prison were not permitted to receive the Arabic-English language edition. The Attorney General of Pennsylvania has since rescinded a state prohibition, and Pennsylvania now permits Muslim inmates to purchase the Arabic-English language edition of the Holy Qur'an
 Knuckles v. Prasse, supra, 302 F.Supp. at 1050.
 
 
 [5]
 E. g., How to Eat to Live, and other publications from the National Islamic Center in Washington, D.C
 
 
 [6]
 The trial court adopted this "clear and present danger" test in instructing the jury as to religious literature: "However, to justify the prohibition of religious literature and the practice of a religion, prison officials must prove that the literature creates a clear and present danger of a breach of prison security. . . ." See Wilson v. Prasse, 325 F.Supp. 9, 12 (W.D.Pa.1971). Appellant has not challenged this instruction and, to the extent this test is applied to religious literature, the point is not before us. Although applying this test in Knuckles, supra, Judge Higginbotham made the cogent observation that a more realistic test would be "clear and probable danger."
 
 
 [7]
 Appellant requested the court to instruct that it was illegal as a matter of law for there to be any interference: (4) with correspondence with any Muslim minister; (5) with a visit by one; (6) with literature; (7) with wearing medallia; (8) with holding religious services; (9) with obtaining an approved Muslim diet
 
 
 [8]
 Indeed, the district court readily upheld the clear and present danger test to rules governing the receipt of religious literature:
 The jury was clearly told that with respect to literature they must find that a clear and present danger of interference with prison discipline existed before they could find rules and regulations interfering with the right to receive religious literature were just and reasonable.
 
 
 [325]
 F.Supp. at 12
 
 
 [9]
 Appellant also contends that "[t]he trial court erred in refusing to instruct that good faith is not relevant for the purpose of awarding general and nominal damages." Specifically he argues that the district court should have charged the following requested instruction:
 
 
 [12]
 Since the defendants promulgated and enforced policies and regulations that interfered with plaintiff's practice and observation of his religion, they have acted illegally toward him. It makes no difference that they did not single plaintiff out for special treatment or that they didn't purposefully desire to injure Mr. Wilson. They are bound by the natural consequences of their conduct
 There are several answers to this contention. First, the requested instruction contains the request for a directed verdict in his favor. This was properly refused. Second, the defendants at no time interposed a defense by pleadings, evidence, or argument that good faith was a defense to liability under the Civil Rights Act. The issue not being joined, the instruction, even if properly submitted or phrased in the explicit language or good faith, was not necessary.
 
 
 [10]
 Fourth: plaintiff's objection to a statement by defense attorney concerning the source of damage payment. At page 241 of transcript, attorney for defendants in his argument to the jury stated:
 "This is a lawsuit against these individuals as individuals, not as employees of the Commonwealth, and there would be no liability on the Commonwealth of Pennsylvania for any verdict which you might be inclined to render in this case.
 If there were to be an award of money damages, it would have to be paid by these individuals out of their own pockets."
 This was promptly objected to by plaintiff's attorney. After considerable discussion between the court and counsel and denial of a Motion for Mistrial, the court instructed the jury as follows: (Tr. 245)
 "Members of the jury the discussion we have had was relative to a remark about the Commonwealth reimbursing or not reimbursing these defendants. The Commonwealth is not a party to this case. This is a suit against three individuals, as you will understand later on when I deliver my charge to you.
 "There is no evidence in this case that the Commonwealth will reimburse them or that the Commonwealth will not reimburse them, and, in any event, that would be irrelevant to this case. You are only to consider the liability of these individuals divorced from anything else."
 It is believed that this instruction by the court cured any false impression or prejudicial effect that might have been derived from the argument of defendants' counsel to the jury.
 That this remark had no effect upon the jury's verdict is evidenced by the fact that regardless of the possibility of reimbursement of defendants by the state, the jury nevertheless refused to find even nominal damages let alone actual or punitive damages against these defendants. From the fact that the jury found for the defendants on all points, not even allowing one dollar of damages against them, it is apparent that the remark that the defendants might have to pay out of their own pockets had no effect upon the jury's thinking.
 
 
 [325]
 F.Supp. at 15-16
 
 
 [11]
 The trial court requested the jury to return a general verdict and also to answer six interrogatories including:
 One, did the defendants improperly, under the facts and applicable law, prevent the plaintiff from corresponding with others of his faith?
 Two, did the defendants, improperly, under the facts and applicable law, prevent plaintiff from having Muslim ministers visit him in prison and perform services as chaplain?
 
 
 [12]
 The district court has observed: "With respect to the prayer for injunctive relief, we believe that this can be dispensed with since plaintiff has on April 9, 1971, been paroled from the Western Correctional Institution. He is no longer subject to the prison disciplines of which he complained and, therefore, his request for injunctive relief is once more moot. See Richey v. Wilkins, 335 F.2d 1 (2d Cir. 1964)." 325 F.Supp. at 12