Reverend Thomas G. WILLIAMS

v.

WARDEN, FEDERAL CORRECTIONAL
INSTITUTION, DANBURY,
CONNECTICUT.

Civ. No. B–78–328.

United States District Court,
D. Connecticut.

May 11, 1979.

William F. Dow, III, Jacobs, Jacobs & Grudberg, New Haven, Conn., for petitioner.

Richard Blumenthal, U. S. Atty., New Haven, Conn., George J. Kelly, Jr., Asst. U. S. Atty., Hartford, Conn., for respondent.

## MEMORANDUM OF DECISION

ELLEN B. BURNS; District Judge.

■ Petitioner is an inmate at the Federal Correctional Institution at Danbury, Connecticut.[1] He is an ordained minister with several religious denominations, including the Franciscans, the Bahais, the Christian Identity Church, the American Fellowship Church, and most recently, the Christian Adamic faith. In late June or early July, 1978, religious materials were sent to petitioner from several religious organizations,

---

1. Petitioner was transferred to a half-way house on April 1, 1979. This transfer, however, does not moot this petition for a writ of habeas corpus. *See Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

including the American Institute of Theology and the American Fellowship Church. Petitioner later learned that this mail was being held by a prison official. Between July 10 and July 13, 1978 he approached several prison authorities, including Father Edwin J. Coyne, the Catholic chaplain, who informed him that the Rev. James V. Forsythe, the Protestant Chaplain, was reviewing the materials. Approximately two weeks later, petitioner received the mail, upon which was stamped, "Office of the Protestant Chaplain."

On July 11, 1978, petitioner wrote a letter to the United States Attorney for the District of Connecticut, which letter was directed to this court. The court, having construed this letter as a petition for a writ of habeas corpus, issued an order to show cause on August 24, 1978. Counsel was appointed for petitioner on October 19, 1978. In a supplemental response filed on October 13, 1978, the government alleged that petitioner was operating a business of "mail order divinity degrees," in which he received a "kick back" for his solicitation attempts, in violation of prison regulations.[2] A hearing was held on January 15, 1979 before this court.

The mail procedures at F.C.I., Danbury, were explained by Father Coyne, the Reverend Mr. Forsythe, and Captain Howard E. Moore as follows: Letters received which have no enclosures are called "open mail" and are inspected at the mail room and later sent directly to an inmate. This process takes approximately one-half to one day and the letters bear no stamp or marking by the prison authorities. *See generally* Federal Prison System Policy Statement Ct. 7300.15A Chg. 1 (July 22, 1977).

However, a different approach is taken for those letters and packages which contain enclosures. The underlying concern of the prison is to prevent the introduction of contraband into the prison. *See* Federal Prison System Policy Statement Ct. 7300.-2A(1) (July 2, 1976). Once an enclosure is found, it is directed to one of three departments. Books are processed through the Educational Department. Once a book is cleared, it is ink stamped, "Personal Property of _____." The purpose of this stamp is to avoid controversy as to the ownership of a book when an inmate leaves prison.[3] Enclosures pertaining to recreational activities are processed through the Recreation Department.[4] Lastly, enclosures relating to religion are processed through the chaplains' office. There are presently two chaplains at F.C.I., Danbury; Father Coyne described their positions as "ecumenical, interfaith chaplains." Father Coyne's responsibilities include supervision of Catholic (both English- and Spanish-speaking), Jewish, and Pan-American inmates; the Rev. Mr. Forsythe is in charge of all other Christian groups and Black Muslims. As the Rev. Mr. Forsythe explained, religious mail generally is easily identifiable by its return address, which usually is a church or religious group. Father Coyne stated that his review is "very limited," its sole function being to eliminate either inflammatory "hate mail" or enclosures which would violate other prison regulations.[5] If an enclo-

---

**2.** The government later retracted its belief that petitioner was involved in a "mail order" ministry operation at F.C.I., Danbury. When asked if he had determined that petitioner was not running a business, Rev. James V. Forsythe replied, "At this point in time, yes."

**3.** Review of enclosures by the various prison officials is not a mutually exclusive proposition, as evidenced by Federal Prison System Policy Statement Ct. 7300.2A(5)(A)(3)(b) (July 2, 1976), which reads in full:

Books shall be paid for from the inmate's special commissary purchase and must be from a publisher or book store. Personal Bibles, which have sentimental attachments, may be received with the approval of the Chaplain. All books will be stamped with the Personal Property stamp in the Education Department before issue to the inmate.

See note 6 *infra*.

**4.** There was no indication at the hearing whether or not recreational items receive any stamp.

**5.** Father Coyne and the Rev. Mr. Forsythe gave the following examples, some actual and some hypothetical, which illustrate religiously oriented items whose receipt would violate other prison regulations: rice crispy cookies with religious pictures and crosses on them, in violation of the rules against the receipt of food;

sure does not fall into one of these two categories, it is imprinted with a stamp which reads "Office of the Protestant Chaplain" or "Office of the Catholic Chaplain." (Sometime after the incidents at issue here, these two ink stamps were replaced by one which reads simply, "Chaplain's Office.") The same purpose is attributed to this stamp as to the stamp for books, e. g., to circumvent confusion as to ownership. The item then is given to the inmate who is its intended recipient.[6]

Petitioner has three objections to this procedure: (1) the delay caused by the diversion of religious materials to the chaplains is unreasonably long; (2) the chaplains should not be allowed to review religious mail; and (3) once a religious item has passed through this procedure, it should not be marked by an ink stamp which mentions the chaplains' office. Petitioner argues that in this screening process, the chaplains are acting as "security personnel" so that there is no need for this task to be performed by them. Also, there is no valid institutional reason to mark materials with the chaplains' stamp if the underlying purpose is the identification of inmate property. For the reasons stated below, the court holds that a legitimate purpose is served by having the chaplains review all religious materials which enter the prison through the mail, but that the ink stamp indicating prison "approval" should not mention the chaplains' office and, in this case, the court further finds the delay caused by the routing to the chaplains' office was unreasonable.

█ The law governing the receipt of religious mail by prisoners has two sources: caselaw concerning the religious rights of prisoners and caselaw involving the receipt of mail by prisoners. In *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972), the Supreme Court stated that an inmate must be given "a reasonable opportunity of pursuing his faith." In *Procu-*

*nier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Court held that prison officials may censor mail to prisoners only if such mail disrupts the substantial governmental interests of security, order, and rehabilitation, but that such mail regulations must be no greater than necessary or essential to the protection of the governmental interests involved. With respect to both the religious rights of and the receipt of mail by prisoners, the judges of this Circuit and District have been especially solicitous. *E. g., Burgin v. Henderson*, 536 F.2d 501 (2d Cir. 1976); *Mukmuk v. Commissioner of Department of Correctional Services*, 529 F.2d 272, 275–76 (2d Cir.), cert. denied, 426 U.S. 911, 96 S.Ct. 2238, 48 L.Ed.2d 838 (1976); *Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975); *LaReau v. MacDougall*, 473 F.2d 974, 979–80 (2d Cir. 1972), cert. denied, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Sostre v. McGinnis*, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); *Ron v. Lennare*, 445 F.Supp. 98 (D.Conn.1977); *United States ex rel. Wolfish v. Levi*, 439 F.Supp. 114, 128–29 (S.D.N.Y.1977), aff'd sub nom. *Wolfish v. Levi*, 573 F.2d 118 (2d Cir. 1978); *Maquire v. Wilkinson*, 405 F.Supp. 637 (D.Conn.1975); and *Sostre v. McGinnis*, 442 F.2d 178, 201 (2d Cir. 1971); cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); *United States ex rel. Wolfish v. Levi*, 428 F.Supp. 333, 344 (S.D.N.Y.1977), aff'd sub nom. *Wolfish v. Levi*, 575 F.2d 118 (2d Cir. 1978); *Stover v. Carlson*, 413 F.Supp. 718 (D.Conn.1976); *Cofone v. Manson*, 409 F.Supp. 1033 (D.Conn.1976); *Giampetruzzi v. Malcolm*, 406 F.Supp. 836, 846–47 (S.D.N.Y.1975); *Williams v. Ward*, 404 F.Supp. 170 (S.D.N.Y.1975); *Chiarello v. Bohlinger*, 391 F.Supp. 1153 (S.D.N.Y. 1975), respectively.

Those cases dealing with religious mail by prisoners have arisen in different contexts. For example, some cases concern the mail-

religious symbols which are too valuable for a prisoner to have; life insurance policies from a church.

6. This procedure is not perfect, however. For example, petitioner received a book entitled, *Digest of the Divine Law*, which was processed through the Education Department, rather than by the chaplains.

ing of letters by prisoners to individuals outside the institution. The appellate court in *Brown v. Hartness*, 485 F.2d 238 (8th Cir. 1973), upheld a prisoner's right to send out a Christmas mailing. Similarly, in *Peek v. Ciccone*, 288 F.Supp. 329, 333–34 (W.D.Mo. 1968), a prisoner who believed he was the reincarnation of Jesus Christ was permitted to communicate this belief to the Pope, despite prison regulations to the contrary. Several courts have held that prisoners have a right to maintain a correspondence with their ministers (usually the Black Muslim prophet, Elijah Muhammad) for the purpose of seeking spiritual advice, *Walker v. Blackwell*, 411 F.2d 23, 24 (5th Cir. 1969); *Cooper v. Pate*, 382 F.2d 518, 521–23 (7th Cir. 1967); *Long v. Katsenbach*, 258 F.Supp. 89, 93 (M.D.Pa.1966).

Another genre of cases involves the censorship of religious materials. The test utilized by most courts for determining when religious literature should be withheld from prisoners is whether the presence of such literature creates a clear and present danger of breach of prison security or discipline. *E. g., Wilson v. Prasse*, 463 F.2d 109, 114 (3d Cir. 1972); *Knuckles v. Prasse*, 435 F.2d 1255 (3d Cir.), *cert. denied*, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 217 (1970), *rehearing denied*, 404 U.S. 877, 92 S.Ct. 33, 30 L.Ed.2d 125 (1971). The piece of literature which has spawned the greatest controversy is the Black Muslim magazine, "Muhammad Speaks." Some courts have found the magazine to be "highly inflammatory" and thus properly censored. *E. g., Wilson v. Prasse, supra; Knuckles v. Prasse, supra; Fulwood v. Alexander*, 267 F.Supp. 92, 95 (M.D.Pa.1967); *Long v. Katzenbach, supra.* Others have held that the magazine poses no security threat. *E. g., Rowland v. Sigler*, 452 F.2d 1005 (8th Cir. 1971); *Northern v. Nelson*, 448 F.2d 1266 (9th Cir. 1971); *Walker v. Blackwell, supra; Long v. Parker*, 390 F.2d 816 (3d Cir. 1968); *Cooper v. Pate, supra.* These cases are inapplicable because the prison officials here did not attempt to prevent the receipt of the religious materials by petitioner.

Petitioner, rather, is concerned with the procedure by which religious items are forwarded through the prison. This court sees no valid objection to the chaplains' participation in the screening process. Captain Moore explained that prison officials prefer to defer to the chaplains' expertise on religious matters. The Rev. Mr. Forsythe urged that a prison chaplain needs to be aware of the religious materials entering a prison so that he may serve the prisoners' religious needs. Father Coyne stated emphatically that he has never screened mail because of his disagreement with its content. All three witnesses stressed that by no means do the chaplains "censor" religious mail. While this process does not interfere with a prisoner's first amendment rights, the court agrees with petitioner that the imprint of the ink stamp used here is offensive to his said rights.

The stated purpose of the stamp is the proper identification of the owner of a religious item. Captain Moore added that the specification of the department through which an item passed is also helpful. However, this position fails for three reasons. First, the relevant stamps ("Office of the Protestant Chaplain," "Office of the Catholic Chaplain," or "Chaplain's Office") fail to identify which prisoner owns the particular item. Whereas the stamp "Personal Property of _____" clearly avoids any dispute as to correct ownership, there is no such protection with regard to the chaplains' stamp. Second, the "personal property" stamp and the chaplains' stamp give only the most general indication of the person through whom the item passed. As Captain Moore admitted, this goal could be accomplished more effectively by having the appropriate prison personnel place their initials in the vicinity of the "personal property" stamp. Last, and most important, it is easy to see how inmates might confuse the chaplains' perfunctory review with theological "approval." Both chaplains articulately stated that they do not pass judgment on the content of religious material when they place their stamp upon it; Captain Moore accurately described the chaplains' task as a "conduit." However, the inmates' percep-

tion may be otherwise, for they see the chaplains' stamp as a form of imprimatur upon their religious beliefs. Petitioner testified that as a result of this procedure and the implication of the stamp utilized, he has reduced the amount of religious mail he receives. This restraint is unreasonable, especially in light of the relatively minor adjustments that can be made by the prison officials to circumvent this infringement. Under the facts of this case, the two to three week delay was unreasonable, for as Rev. Forsythe stated, prisoners receive "very little" religious mail.

The fact that the Christian Adamic faith is a religion developed by petitioner does not diminish his religious freedoms. Religions other than the major religions have been afforded first amendment protections, e. g., *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1943) (the "I Am" movement), even in prison settings, *Kennedy v. Meacham*, 540 F.2d 1057 (10th Cir. 1976) (a "Satanic" religion); *Remmers v. Brewer*, 494 F.2d 1277 (8th Cir.), *cert. denied*, 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286 (1974) ("Church of the New Song").[7]

In sum, the court holds that the utilization of the prison chaplains to review all religious items which enter the prison through the mails violates no rights of petitioner, provided they shall not affix to any item an ink stamp which contains the words "chaplain's office" and provided any such item, not constituting a clear danger of breach of prison security or discipline, shall be given to the inmate within a reasonable time following its receipt at the institution.

SO ORDERED.

7. However, in a footnote, the Eighth Circuit cautioned that should the church prove to be a hoax, the matter should be dealt with by prison officials. 494 F.2d at 1278 n. 1. This church also generated much litigation in the Fifth Circuit by Theriault, the founder of the Church of the New Song. *Theriault v. Carlson*, 339 F.Supp. 375 (N.D.Ga.1973), *vacated and remanded*, 495 F.2d 390 (5th Cir.), *rehearing denied*, 498 F.2d 1402 (5th Cir.), *cert. denied sub nom. Theriault v. Silber*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974), *on remand*, 391 F.Supp. 578 (W.D.Tex.1975), *vacated and re-*

*manded*, 547 F.2d 1279 (5th Cir.), *rehearing denied*, 551 F.2d 863 (5th Cir.), *cert. denied*, 434 U.S. 871, 98 S.Ct. 216, 54 L.Ed.2d 150, *rehearing denied*, 434 U.S. 943, 98 S.Ct. 441, 54 L.Ed.2d 306 (1977) *on remand*, 453 F.Supp. 254 (W.D.Tex.), *appeal dismissed pending proper notice of appeal*, 574 F.2d 197 (5th Cir.), *appeal dismissed with prejudice*, 579 F.2d 302 (5th Cir. 1978). In the final opinion on the merits, the district judge wrote that the "Church of the New Song appears not be a religion, but rather as a masquerade . . . ." 453 F.Supp. at 260.