Father John J. O'MALLEY et al.,
Appellants,

v.

Joseph R. BRIERLEY, Superintendent of
the State Correctional Institution at
Pittsburgh, et al.

No. 72–1056.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit.
Rule 12(6) Feb. 2, 1973.

Decided April 30, 1973.

Harry F. Swanger, Leonard I. Sharon, James H. Logan, Paul D. Boas, Pittsburgh, Pa., Stanley A. Bass, NAACP Legal Defense Fund and Educational Fund, New York City, for appellants.

Frederick N. Frank, Asst. Atty. Gen., John J. Kennedy, Jr., Asst. Atty. Gen., J. Shane Creamer, Atty. Gen., Harrisburg, Pa., for appellees.

Roslyn M. Litman, Pittsburgh, Pa., for American Civil Liberties Union, Greater Pittsburgh Chapter, for amicus curiae.

Before SEITZ, Chief Judge, ALDISERT, Circuit Judge, and FISHER, District Judge.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question presented on this appeal is the propriety of summary judgment in an action brought under the Civil Rights Act, 42 U.S.C. § 1983, by certain Catholic priests and prisoners, contending that their First Amendment rights were abridged when state prison officials withdrew from the priests previously granted privileges to conduct religious services and counseling within the prison. Ruling that plaintiffs' complaint failed to set forth a claim upon which relief could be granted, the district court entered summary judgment for the defendants. We affirm the judgment as against the priest-plaintiffs, but reverse the judgment as against the prisoner-plaintiffs.

Father John O'Malley and Father Augustus Taylor, although not official prison chaplains, began to visit Western Penitentiary in 1969, and soon developed a close spiritual relationship with many inmates, both black and white. In November, 1969, Father Taylor conducted an Afro-American Mass in the prison chapel, the alleged purpose of which was to "relate the essentials of the Catholic Mass more significantly to the black experience." Shortly after the celebration of this Mass both Father Taylor and Father O'Malley were denied further visitation privileges at the prison.

By affidavit, Joseph R. Brierley, Superintendent of Western Penitentiary, described the Mass:

The Afro-American Mass lacked any semblance of a religious service and was in fact a political rally.

It did not attract Catholic inmates but rather self-proclaimed Black Nationalists and Black Panthers. In fact less than two per cent of the inmate population, or ten prisoners are Negroes who profess Roman Catholicism.

Plaintiff Father Taylor began the Afro-American Mass by holding his clenched fist in the air. He said "I do not believe in a honky Christ." He

went on to say that he is a revolutionary. The entire theme of his address to those in attendance was black militancy. There was little reference at all to any religious matters, with the exception of the receiving of communion which was indiscriminately given to non-Catholic prisoners. Father Taylor's speech was followed by inmates standing in the pulpit giving testimonials to Black Nationalism.

Responding by affidavit, Father Taylor insisted:

The Mass conducted at Western Penitentiary in November 1969 was presented in the traditional Catholic Mass structure. Extemporaneous prayers and prescribed prayers of rite were utilized, communion was offered and the essential liturgy was followed. I was assisted by Father Dennis Kinderman. Within this structure, I talked about Jesus and how he was related to them (Black Prisoners) . . . The real message I was seeking to convey was that Jesus Christ and Christianity was identified with them and their condition . . . Any reference to a Honky Christ was a call to examine exactly what Jesus Christ meant and to reject the White false values we are told to worship and which are embodied in the traditional White image of Christ. In saying this I was not suggesting a form of Black racism and or any interpretation that being pro-Black meant anti-White was incorrect. I suggested we were above that and that our consciousness of Blackness meant recognizing, discovering, enjoying, and living our Afro-American heritage. In this process we would discover that Black people and their collective mind are "together" just as Jesus Christ was "together" . . . I tried to conclude this theme by urging all those Black people in attendance to spread the peace, harmony, and togetherness which they had as a whole congregation throughout the prison among Black and White prisoners alike.

Several months later, following negotiations with and intercession by the state attorney general, both priests were readmitted to very limited visitation privileges.[1] Then, on September 20, 1971, shortly after the Attica, New York prison riot, the priests participated in what they described as a "peaceful and lawful demonstration . . . held outside the gates of the Western Penitentiary in support of prison reform, the elimination of racism in prison, and in sympathy for those persons slain at Attica State Penitentiary in New York." Two days later, Fathers Taylor and O'Malley received a letter, dated September 20, 1971, from Superintendent Brierley, which stated in part:

In the past you have been denied permission to visit with members of our population for a number of reasons, many of which we have previously discussed. However, because of your persistence to be permitted to again visit here and your voiced good intentions to be of service, as well as a request in your behalf by my superiors, I relented and gave the approval for your visiting members of our prison population. However, after witnessing your so very active part in the demonstration outside the institutional walls at noon today, I can readily see that it is your sole purpose to incite the prison population to riot and I am therefore forced to rescind the approval permitting you to enter the confines of this institution. . . .

Superintendent Brierley indicated that he based his actions upon the following observations and conclusions:

The speeches being made at the demonstration could be heard in the South Block of the institution. The

---

1. No longer were the priests permitted to meet with any prisoners who desired counseling, but rather, were restricted to meeting their own "parishioners," and then only in the visiting room. Moreover, the priests were denied access to the prison chapel.

inmates in that section of the institution soon told other inmates in other parts of the institution what was being said by the demonstrators.

The demonstrators charged the officials at Western Penitentiary with failing to communicate with the prisoners and with oppression of the prisoners. There was an outburst from the prisoners who could hear the demonstrators and the demonstrators answered the outburst.

At this point I took notice of the probable effect of this demonstration on the inmate population. Tension was already high in the prison because of the Attica State Prison incident which had preceded the demonstration by only a few days.

Because I feared the inmate population would be agitated by this demonstration, I had the inmates in the South Block moved to another part of the institution so they could not hear what the demonstrators were saying. At no time did I order the demonstrators to move. In fact, no prison official moved beyond the prison gate during the course of the demonstration.

I personally observed both plaintiff Father O'Malley and plaintiff Father Taylor taking part in this demonstration. It was my carefully considered opinion that because of their participation in a demonstration of this nature, it would be a serious security risk to readmit them as spiritual advisors inside the institution. There was no doubt in my mind that the purpose of this demonstration was to incite the prisoners to riot. Therefore I could not jeopardize the safety of the institution by permitting any of the participants in that demonstration inside the institution in the future.

Superintendent Brierley explained further that there has never been any interference with the practice of the Catholic faith by prisoners, and that there are two Catholic prison chaplains, one full-time and one part-time. These priests conduct services in the prison chapel every Sunday and on every Holy Day, and have daily access to visit and counsel all Catholic prisoners.

By affidavit, Father S. Richard Terza reported that he was assigned by the Bishop of the Diocese of Pittsburgh to the position of full-time Catholic chaplain at Western Penitentiary. Father Terza stated that he "had the fullest possible cooperation from [all prison officials] in all aspects of serving the Catholic inmates," that he has "free access to all Catholic inmates who desired religious counsel, . . . and [a]t no time has the practice of the Catholic faith by inmates of the institution been interfered with by the officials of the institution, nor have these officials discriminated among Catholic prisoners on racial grounds." Moreover, Father Terza observed that "[t]here is no tenet or article of the Roman Catholic faith which permits a member of the laity to dictate the selection of his parish priest."

Because prison authorities withdrew their visitation privileges, the priests asserted a deprivation of First Amendment rights and sought injunctive and declaratory relief against the ban. The priests requested money damages as well, compensatory and punitive, "in an amount to be determined by a jury for the humiliation, public scorn and derision suffered by them."

As a matter of preliminary importance, it is essential to note that the priests are suing in their own right. They seek personal injunctive relief and money damages for injuries allegedly sustained by *them*. The prisoners, too, are suing in their own right, for themselves and for a class of inmates similarly situated. It is inappropriate, therefore, to construe the claims of the priests as derivative claims of others "not immediately before the Court [which] could not be effectively vindicated except through an appropriate representative before the Court. See Barrows v. Jackson, 346 U.S. 249, 255–259,

73 S.Ct. 1031, 1034, 1036, 97 L.Ed. 1586 [1953]; Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 183–187, 71 S.Ct. 624, 95 L.Ed. 817 [1951] (Concurring Opinion)." NAACP v. Alabama, 357 U.S. 449, 458, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958).

■■ Guiding our inquiry, then, will be the general rule that "a litigant may only assert his own constitutional rights or immunities," United States v. Raines, 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L. Ed.2d 524 (1960); McGowan v. Maryland, 366 U.S. 420, 429, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and the principle that "one cannot sue for the deprivation of another's civil rights." C. Antieau, Federal Civil Rights Acts, Civil Practice, § 31 at 50–51.[2]

In delineating the specific constitutional deprivation alleged to have been suffered by reason of the action of the state prison officials, the priests construct a two-pronged argument. They contend, first, that they have been deprived of their First Amendment religious freedom right to conduct religious services and offer religious counsel in a state institution. Secondly, as a result of their valid exercise of the First Amendment's free speech clause, they suggest their First Amendment religious freedom right to conduct prison services and counseling has been abridged.

The priests do not urge, of course, that they have a constitutional right to be an inhabitant of the prison, and while inside the walls, were denied the opportunity to exercise their religion freely. Rather, their argument is the converse; that they have a First Amendment right to enter the walls so that others—the inmates—may vindicate their free exercise right. Implicit in this contention is the proposition that a clergyman has a First Amendment right, enforced through the Fourteenth Amendment, to conduct religious services and offer religious counsel in a state institution.

Superficially, this argument, endowed with the familiar ringings of freedom of religion, appears sound. This proposition, however, is premised upon the thesis that a state may properly bestow upon a clergyman a right of constitutional dimension to practice a religion in a state institution under the auspices, sponsorship, and protection of the state government and the federal constitution. Such a notion, we suggest, charts a collision course with the prohibitions of the Establishment Clause. For in their enthusiasm to vindicate alleged constitutional rights, as evidenced by their requests for injunctive and declaratory relief, and in their effort to recoup pecuniary losses allegedly sustained for "humiliation, public scorn and derision," the priests have focused both eyes on the Free Exercise Clause of the First Amendment without a glance in the direction of that amendment's Establishment Clause: "Congress shall make no law respecting an establishment of religion. . . ." It is this distinction between the Establishment Clause and the Free Exercise Clause that stands at the very heart of the First Amendment.

To conclude otherwise would require a complete re-evaluation of the philosophical underpinnings of the school prayer cases typified by Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Were the thesis of the priests deemed valid, there would be little constitutional barrier preventing a clergyman from asserting a right to deliver religious instruction and conduct prayer services in a public school classroom, based solely upon the

2. See United States v. Biloxi Municipal School District, 219 F.Supp. 691, 694 (S. D.Miss.1963), aff'd, 326 F.2d 237 (5th Cir. 1964), cert. denied sub nom. United States v. Madison County Board of Education, 379 U.S. 929, 85 S.Ct. 324, 13 L. Ed.2d 341 (1964): "Only persons actually deprived of their individual civil rights can redress such rights." See also Krum , v. Sheppard, 255 F.Supp. 994 (W.DMich. 1966), aff'd, 407 F.2d 490 (6th Cir. 1967); Brown v. Board of Trustees of LaGrange Independent School District, 187 F.2d 20 (5th Cir. 1951); Williams v. Kansas City, 104 F.Supp. 848, 857 (W.D.Mo. 1952).

contention that he was invited therein by the students, faculty, and school board to vindicate the students' free exercise right. However, because these priests are suing in their own right, we put aside a comparison of the rights of prison inmates to the free exercise of religion *vis a vis* the rights of public school students, and evaluate the problem solely from the standpoint of a clergyman's independent right. Our analysis draws us inexorably to the distinction between the two competing prohibitions in the First Amendment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." [3]

Appellant priests invite our reliance upon cases dating from the time of Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), and suggest that we adopt in the prison context the principle that "spreading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types." 319 U.S. at 110, 63 S.Ct. at 873.

We are aware of the perils ascribed by Justice Harlan to "[a]ny attempt to formulate a bright-line distinction" between cases raising "establishment" and "free exercise" questions. McGowan v. Maryland, *supra*, 366 U.S. at 463, 81 S.Ct. at 1155 (concurring opinion). Nevertheless, prior to taking the plunge suggested by appellants and the *amicus curiae*, we embark upon an examination of the priests' contentions in light of the myriad teachings of the Supreme Court which have zealously protected Jefferson's "wall of separation between church and State."

Our own journey commences with Justice Black's admonition in Everson v. Board of Education, 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947): "Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups *and vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.'" (Emphasis supplied.) Thus, "[n]either a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, *aid all religions*, or prefer one religion over another." 330 U.S. at 15, 67 S.Ct. at 511. (Emphasis supplied.) "The Amendment's purpose," Justice Rutledge wrote in dissent in *Everson*, "was not to strike merely at the official establishment of a single sect, creed or religion, outlawing only a formal relation such as had prevailed in England and some of the colonies. Necessarily it was to uproot all such relationships. But the object was broader than separating church and state in this narrow sense. It was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion." 330 U.S. at 31–32, 67 S.Ct. at 519.[4]

3. Clearly this is not a distinction without a difference. For example, in McGowan v. Maryland, 366 U.S. 420, 430, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), in a defense to a state prosecution brought under a Sunday closing law, defendants sought standing on the basis of the Free Exercise Clause. The Court denied standing on the basis of this clause because appellants alleged only economic injury to themselves, and not "any infringement of their own religious freedoms due to Sunday closing." Nevertheless, the Court did accord defendants' standing to challenge this law as "respecting an establishment of religion," on the basis that they "concededly have suffered direct economic injury, allegedly due to the imposition on them of the tenets of the Christian religion."

4. More recently, in Abington School District v. Schempp, 374 U.S. 203, 218–219, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the Court endorsed Justice Rutledge's *Everson* formulation:

Our constitutional policy . . . does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise. But to that end it does deny

Justice Jackson, too, although dissenting from the specific result reached in *Everson,* noted his agreement with the absolutism of Justice Black: "There is no answer to the proposition . . . that the effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayers' expense. . . . This freedom was first in the Bill of Rights because it was first in the forefathers' minds; it was set forth in absolute terms, and its strength is its rigidity. It was intended not only to keep the states' hands out of religion, but to keep religion's hands off the state. . . ." 330 U.S. at 26–27, 67 S.Ct. at 516, 517.

Much of the same emanates from McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), where the Court held "released time" religious instruction "a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith," and, hence, violative of the First Amendment which requires that both religion and government be "left free from the other within its respective sphere." 333 U.S. at 210–212, 68 S.Ct. at 464, 465.

■ Thus, if there is one principle to be distilled from *Everson, McCollum,* and their progeny,[5] it is that the First Amendment was intended, and has been interpreted, to forbid not only governmental preference of one religion over another, but any establishment or encouragement of religion by the state.[6] In Abington School District v. Schempp, *supra,* 374 U.S. at 222, 83 S.Ct. at 1571, the Court announced a workable test: "[W]hat are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

If these views formed the jurisprudential underpinning of the school prayer cases, it would seem that rejection of the priests' contention is *a fortiori.* To conclude otherwise would be to suggest in the context of the public school prayer format that although a student or secular teacher may not read passages from the Bible or recite some non-denominational prayer, a clergyman is clothed with the constitutional right to enter that classroom and lead the prayers under the pretext that his presence is demanded by students under the Free Exercise Clause.

As we reject the notion that a state or the federal government may foster or support, protect or encourage any religion or group of religions, so do we find without support the proposition that religions in general are anathema to every conceivable state or federal function. As Justice Black wrote in Engel v. Vitale, 370 U.S. 421, 434, 82 S.Ct. 1261, 8

that the state can undertake or sustain them in any form or degree. For this reason the sphere of religious activity, as distinguished from the secular intellectual liberties, has been given the twofold protection and, as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private. [330 U.S. at 52, 67 S.Ct. at 529].

5. There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the "free exercise" of religion and an "establishment" of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. Zorach v. Clauson, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). McGowan v. Maryland, supra.

6. See also Mangold v. Albert Gallatin Area School District, 438 F.2d 1194 (3d Cir. 1971).

L.Ed.2d 601 (1962): "The history of man is inseparable from the history of religion."

This being so, religion and the activities of the state interact at several points. Sessions of this and other courts commence with a supplication by the crier: "God save the United States and this Honorable Court." Similarly, each House of the Congress has a Chaplain to pronounce an opening prayer, as do most larger military units. The Supreme Court has never dealt specifically with these interactions of the spheres of God and Caesar, but instead has been satisfied to announce that although the state may not protect or prefer religion, neither may it act antagonistically toward religion. Therefore, although the absolutism of *Everson* and *McGowan, supra,* transposed to the instant case, might be read to infer a lack of constitutional props for the concept of prison chaplaincies, more recent decisions emphasize a "principle of neutrality" between religions and the state which might countenance such an institution.

For example, although Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), stated that "within the scope of its coverage" the prohibitions of the First Amendment are absolute (note 5, *supra*), the Court went on to observe that the First Amendment "does not say that in every and all respects there shall be a separation of Church and State." 343 U.S. at 312, 72 S.Ct. at 683.

A similar rationale underlay Engel v. Vitale, *supra*. In holding unconstitutional the voluntary recitation in public schools of a state-composed, denominationally neutral prayer, the Court stated that whereas the First Amendment was designed to prohibit governmental control of religion and prayer, it was not meant to inhibit either. 370 U.S. at 435, 82 S.Ct. 1261. On the contrary, "the value of religious training, teaching

and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state," form the basis of the Free Exercise Clause. Abington School District v. Schempp, *supra*, 374 U.S. at 203, 83 S. Ct. 1560. See also Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed. 2d 790 (1971); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

Outside the confines of school prayer cases, the principle of neutrality gained endorsement in Walz v. Tax Commission, 397 U.S. 664, 669–670, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), where the Court ruled constitutional tax exemptions for real property owned by religious organizations and used solely for religious worship. Moreover, the Court disavowed Justice Jackson's belief that the First Amendment's "strength is its rigidity," *Everson, supra,* 330 U.S. at 26, 67 S.Ct. 504, noting instead that "rigidity could well defeat the basic purpose of these provisions." 397 U.S. at 669, 90 S.Ct. at 1411.

In light of Chief Justice Burger's formulation that the purpose of the Establishment Clause was to insure that "no religion be sponsored or favored, none commanded, and none inhibited," *Walz, supra,* 397 U.S. at 669, 90 S.Ct. at 1411, how should a court view the institution of prison chaplaincies? Is the creation by the state of an official position for a cleric, granting to him in a state building access to members of a state-controlled prison population, state "sponsorship, financial support, and active involvement . . . in religious activity?" 397 U.S. at 668, 90 S.Ct. at 1411. Conversely, is the refusal by a state officer to permit officially designated ministers of religion to counsel state-controlled prisoners on state property, state "inhibition" of religion?[7]

---

7. Both Madison and Jefferson expressed positive doubts about the institution of chaplaincies. In Madison's "Detached Memoranda," he wrote: "The establish-

Whatever be the rights of a cleric, designated by his superiors and accepted by prison officials as official prison chaplain, to enter within the walls to counsel or conduct religious services, we need not decide in this appeal. Neither Father Taylor nor Father O'Malley are official prison chaplains at Western Penitentiary, and they do not seek entrance to the prison on the basis of any alleged right of an official prison chaplain to do so. Moreover, as previously observed, they do not contend that they have a right to be an inhabitant of the prison. Rather, their contention lays between these two extremes, and suggests the existence of some vaguely defined legal preference accorded by the Constitution to ministers of religion to conduct religious services and counseling within a state institution. However, there is no principle in the law granting to clerics an absolute right to enter a prison, and Fathers O'Malley and Taylor have no constitutional right to enter Western Penitentiary. Thus, the priests' complaint that they have been denied fundamental First Amendment rights under the Free Exercise Clause clearly misses the mark because no such rights exist in this context. It must unalterably follow that the state cannot be charged with denying that which does not exist.

Alternatively, the priests argue that state authorities have infringed upon the exercise of their First Amendment rights "[to] peaceably assemble [to speak freely] and to petition the Government for redress of grievances," and it was solely because of the exercise of these rights that they have been denied admission to the prison.

The priests urge our application of the principle that one's free speech rights may be vindicated even though the expression itself was not curtailed, but a deprivation of another right resulted from the exercise of the freedom of expression. The priests and the *amicus curiae* direct us to a trilogy of decisions providing a basis for this principle: Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); Kiiskila v. Nichols, 433 F.2d 745 (7th Cir. 1970); Taylor v. Kentucky State Bar Association, 424 F.2d 478 (6th Cir. 1970). None of these cases compel the suggested result.

In *Kiiskila*, the Seventh Circuit dealt with an order of the commanding officer of a military base permanently excluding from the base appellant, a civilian employee of a credit union situated on the base. The commanding officer believed that appellant's casual conversations with military personnel concerning the activities of the Veterans for Peace in Vietnam were "prejudicial to good order and discipline" in the military. 433 F.2d at 746–747. As a result of her exclusion from the military post, appellant's civilian employer reluctantly dispensed with her services solely because the "military authorities have made it impossible to retain her." The court de-

---

ment of chaplainship to Congress is a palpable violation of equal rights, as well as of Constitutional principles. . . . If Religion consists in voluntary acts of individuals, singly, or voluntarily associated, and if it be proper that public functionaries, as well as their Constituents should discharge their religious duties, let them like their Constituents, do so at their own expense." William and Mary Quarterly, III, 554. "He classified chaplainships for the army and navy 'in the same way,' as forbidden 'establishments' or an 'establishment of a national religion.'" Levy, Judgments, Essays on American Constitutional History, 206. As rector of the University of Virginia, Jefferson rejected a proposal to hold religious services on university property on Sundays. R. Freeman Butts observed that "the university did not even appoint a chaplain until 1829 and then only after Madison, following Jefferson as rector, had provided that the cost of maintaining the chaplain be paid by the students themselves on a voluntary basis. " 'Being altogether voluntary,' declared Madison, 'it would interfere neither with the characteristic peculiarity of the University, the consecrated principle of the law, nor the spirit of the country.'" Levy, *Ibid.* at 214. But see Abington School District v. Schempp, 374 U.S. at 297, 83 S.Ct. 1560 (concurring opinion, Brennan, J.).

termined that exclusion of appellant from the base and the termination of her employment violated her First Amendment rights of speech and association, and added: "A citizen's right to engage in protected expression or debate is substantially unaffected by the fact that he is also an employee of the government and, as a general rule, he cannot be deprived of his employment merely because he exercises those rights. This is so because dismissal from government employment, like criminal sanctions or damages, may inhibit the propensity of a citizen to exercise his right to freedom of speech and association. Pickering v. Board of Education, [391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)]." [8]

Central to both *Kiiskila* and *Pickering* is the fact of public employment. In the case before us, the issue of public employment is not present, and, therefore, the restrictions imposed upon a state for termination of public employment as a result of an exercise of First Amendment rights are neither applicable nor controlling. Indeed, in *Kiiskila*, the court emphasized that it was deciding neither an issue where access to the base was denied but employment was not jeopardized, nor one where an individual not employed on the base was excluded for the same reasons. 433 F.2d at 748 n. 4.

*Baird, supra*, subsuming the same issue as *Taylor, supra*, is no more compelling. In *Baird*, the Supreme Court reversed the judgment of the Arizona Supreme Court which denied petitioner admission to the state bar solely because she refused to answer questions concerning her personal beliefs or her affiliations with organizations which advocate certain ideas about government, *viz.*, whether she had ever been a member of the Communist Party or any organization that "advocates overthrow of the United States Government by force or violence." The Court observed that the power of a state to inquire into a person's beliefs and associations is circumscribed by the First Amendment because such inquiries "discourage citizens from exercising *rights* protected by the Constitution." 401 U.S. at 6, 91 S.Ct. at 706 (Emphasis supplied.) And, the Court continued, "[t]he practice of law is not a matter of grace, but of right for one who is qualified by his learning and his moral character." 401 U.S. at 8, 91 S.Ct. at 707.[9]

Thus, clearly the necessary predicate to relief under the *Taylor-Baird* theory is proof of deprivation of a statutory or constitutional right as a result of the protected expression. In the context of the priests' claim, therefore, it would be incumbent that they prove a stripping of such a right because of the exercise of their protected right of expression. As has been demonstrated, however, the alleged deprivation was of a claimed constitutional right to practice their religious profession within the penitentiary walls, a right we have shown to be nonexistent.

■ Nor do we detect error in the district court's decision to grant defendants' motion for summary judgment.

---

8. Although it is unclear whether the credit union employer in *Kiiskila* was actually an arm of the government, the court viewed appellant as a government employee:
   In permitting the credit union to operate at Fort Sheridan, the Army undoubtedly contemplated that access to the base would be required by civilian employees including Kiiskila. Moreover, it must also have been aware that termination of a civilian employee's access to the base would result in the loss of his employment. Thus, in terms of the interests of both plaintiff and the Army, the exclusion order in this case is essentially equivalent to dismissal of a person from government employment. Cafeteria & Restaurant Workers Union v. McElroy, [367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)].
   433 F.2d at 748.

9. See also Orr v. Trinter, 444 F.2d 128, 133 (6th Cir. 1971): "To prove a claim under 42 U.S.C. § 1983, a plaintiff must show (1) action taken under color of State law, and (2) a deprivation of a constitutional right as a result of that action."

The court decided no issue as to any material fact contrary to the priests. Specifically, the district court did not decide that the priests were barred from the prison because Superintendent Brierley validly determined them to be security risks. Nor, of course, did the court find that their privilege to enter within the walls was terminated in retaliation for their exercise of constitutionally protected rights of free speech. On the contrary, throughout its opinion, the district court refers consistently to the priests' complaint, and found only that it failed to state a claim upon which relief could be granted. As this court noted in affirming an identical procedure in a closely related context: "It is no legitimate function of the court to assume the existence of a genuine issue of material fact when in truth none exists." Gittlemacker v. Prasse, 428 F.2d 1, 5 (3d Cir. 1970). Simply stated, because the priests enjoyed no constitutional right to enter the prison, a grant of summary judgment for defendants was a proper method of terminating an action based upon such a non-existent right.

To find that these priests possess no constitutional right to visit the inmates at Western Penitentiary is not, of course, to say that the inmates may not possess a right to have the priests visit them. Although participation by the priests in a religious service requires consideration of the Establishment Clause, participation by the inmates brings into focus the Free Exercise Clause. And here the inmates stand, if not on bedrock, at least on much firmer footing than the priests.

We take as a beginning point Gittlemacker v. Prasse, *supra*, 428 F.2d at 4: "To determine, with precision, those rights which follow an inmate into prison involves a process of weighing and balancing conflicting interests. The desire that there be a maximum opportunity for the exercise of rights and privileges may often collide with the practical necessities of managing and administering a complicated penal community.

The task of striking the proper balance between these conflicting interests is generally within the competence of the prison authorities. Thus, the federal courts have been understandingly reluctant to intervene in matters of state prison administration, recognizing a wide latitude for judgment and discretion must be extended to prison officials.

"At the same time, however, the federal courts have been sensitive to certain particularized complaints, foremost among which have been allegations of religious discrimination. In such cases, the courts have not hesitated to intervene where prison officials have unreasonably attempted to curtail the practice of religion by prison inmates."

In United States ex rel. Jones v. Rundle, 453 F.2d 147, 149 (3d Cir. 1971), we said that a prisoner's right to practice his religion is not "absolute. Such right may be reasonably restricted in order to facilitate the maintenance of proper discipline in the prison." In Wilson v. Prasse, 463 F.2d 109, 113–114 (3d Cir. 1972), we said: "In *Gittlemacker*, we explicitly referred to the test as 'The requirement that a state interpose no unreasonable barrier to the free exercise of an inmate's religion,' 428 F.2d at 4, and in so doing we were adhering to the test set forth in Long v. Parker, 390 F. 2d 816, 820 (3d Cir. 1968): 'Where . . . the charge is made that the regulations imposed by prison authorities restricting religious practices fall more harshly on adherents of one faith than another, the courts will scrutinize the reasonableness of such regulations.' "

It appears, therefore, that where a state does afford prison inmates the *opportunity of practicing a religion, it may not, without reasonable justification, curtail the practice of religion by one sect.*

The inmates' complaint that the curtailment of the visitation privileges of Fathers O'Malley and Taylor constituted religious discrimination with racial overtones fits the classic mold of a

claim cognizable under § 1983 for which relief may be granted. Thus, it was improper to dismiss the complaint of these plaintiffs on the ground stated by the district court.

■ It remains only to determine whether summary judgment was appropriate under the circumstances, considering all of the pleadings, and the supporting and opposing affidavits. If, on balance, there remained no "genuine issue for trial," then summary judgment could have been appropriate. F.R.Civ.P. 56(e).

Our independent examination of these materials convinces us that at the posture of the case in the trial court, it was not appropriate to enter summary judgment. This could only have been possible if, under the *Long-Fittlemacker-Wilson* test of this circuit, the exclusion of Fathers O'Malley and Taylor was, under the circumstances, a reasonable regulation as a matter of law. Not only did the court not make such a specific finding, but we are persuaded that there was sufficient conflict in the opposing affidavits so as to require the question of reasonableness of the regulation to be resolved by a fact finder. For example, appellants' affidavits describe the Afro-American Mass as a deeply religious, highly significant form of worship, whereas Superintendent Brierley termed the exercise a political rally based upon the black militancy theme. Also, appellants asserted that the September 20, 1971, demonstration was entirely peaceful, lawful and orderly, and was in support of prison reform and the elimination of racism. Superintendent Brierley, on the other hand, viewed the demonstration as an attempt "to incite the prison population to riot," and denied that it was peaceful, orderly and lawful.

■ Because we are remanding for a trial, we emphasize that the state may not interpose an unreasonable barrier to the free exercise of an inmate's religion. The test for the fact finder, therefore, is simply whether under all of the circumstances, the state has sustained its burden of proof that it was reasonable for the prison authorities to prevent the two priests from engaging in any activities within the prison. In arriving at its "reasonableness" determination, the fact finder shall find the regulation to be reasonable only if the alternative chosen (complete exclusion) resulted in the least possible "regulation" of the constitutional right consistent with the maintenance of prison discipline. The state authorities are held to the reasonableness test only, and are not required to prove as a condition precedent to the imposition of the regulation that the presence of the priests constituted a "clear and present danger" to the prison.[10] As we said in Wilson v. Prasse, *supra*, 463 F.2d at 114, "such a [jury] instruction as to all prison rules and regulations would have been gross error."

We express no opinion whether the inmates' suit may properly proceed as a class action.

The judgment in favor of the appellees against appellants, Father John O'Malley and Father Augustus Taylor, will be affirmed. The judgment in favor of the appellees against the named appellant inmates will be reversed and the cause remanded for proceedings not inconsistent with the foregoing.

10. This phrase, originally appearing in Long v. Parker, *supra*, the seminal case dealing with the test of reasonableness, was used only in the context of the distribution of religious literature. In Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969), aff'd, 435 F.2d 1255 (3d Cir. 1970), Judge A. Leon Higginbotham suggested that the more realistic test for imposing restrictions on the reception of religious literature was proof of a "clear and *probable* danger." While we found no error in the use of the phrase "clear and present danger" in the *Wilson* court's charge on religious literature, we impliedly approved the Higginbotham suggestion as the appropriate test for such literature. 463 F.2d at 112 n. 12.