Harold X (Smith) for himself and all other Pennsylvania Graterford Prisoners similarly situated

v.

Mr. J. BRIERLEY, Special consultant to the Commissioner of the Bureau,

Mr. William B. Robinson, Commissioner of the Bureau,

Mr. Julius T. Cuyler, Superintendent of Graterford,

Mr. Melvin C. Hunter, Correctional Industry Division Supervisor.

Civ. A. No. 76–3582.

United States District Court, E. D. Pennsylvania.

Sept. 19, 1978.

André L. Dennis, Philadelphia, Pa., for plaintiff.

Margret E. Anderson, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

OPINION

LUONGO, District Judge.

Plaintiff, a prisoner confined at the State Correctional Institution at Graterford, Pennsylvania, filed this complaint *pro se* on November 23, 1976. He alleges that the statewide inmate compensation system, currently in force at Graterford, violates his civil rights. Plaintiff seeks damages and equitable relief under the 1871 Civil Rights Act, 42 U.S.C. §§ 1983, 1985 (1970), and the 1866 Civil Rights Act, 42 U.S.C. § 1981 (1970), as well as declaratory relief. Defendants are the Pennsylvania Commissioner of Correction, a special consultant to the Commissioner who helped to develop the inmate compensation system, the superintendent of Graterford, and the Industries Division Manager at Graterford.

Defendants, after filing an answer, moved for summary judgment. Counsel was appointed to represent plaintiff, and a brief in opposition to defendants' motion was filed on behalf of plaintiff. Following oral argument on the motion for summary judgment, the parties stipulated that all claims asserted in the complaint that were not raised in plaintiff's brief would be dismissed without prejudice. *See* Document No. 14. With respect to the claims that *were* advanced in plaintiff's brief, I have considered carefully the points raised on both sides, and I conclude, for the reasons set out in this opinion, that defendants' motion should be granted as to some, but not all, of those claims.

The factual record presently before me consists of the initial pleadings, affidavits executed by defendants Brierley and Hunter, a memorandum written by Brierley summarizing the inmate compensation system, a copy of the unpublished regulations governing the inmate compensation system, a copy of the "Inmate Progress Report" form used by prison supervisors to evaluate inmates as workers, and a number of other affidavits.[1] On this motion for summary

---

1. Plaintiff's counsel submitted a four-page document, styled as plaintiff's "affidavit," as Ex- hibit 1 to Plaintiff's Memorandum of Law. Although this document bears the signature of

judgment, of course, I must view the evidence in the light most favorable to the party opposing the motion. *E. g., Bishop v. Wood*, 426 U.S. 341, 347 n. 11, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 784 (3d Cir. 1978).

In essence, the inmate compensation system "establishes the principles and procedures used in paying inmates for their labor" at all Pennsylvania correctional institutions. ICS § 01.[2] Plaintiff challenges several different aspects of the system, and so I will discuss the pertinent sections in conjunction with each of plaintiff's legal theories.

## CRUEL AND UNUSUAL PUNISHMENT

Plaintiff's broadest contention is that the inmate compensation system amounts to cruel and unusual punishment because the

wages paid to inmates are well below even the minimum wage established by state and federal law for most workers. It is undisputed that inmates are paid between ten and twenty-nine cents per hour, depending on the degree of skill that their jobs are deemed to require. ICS §§ 7, 8. Plaintiff earns a total of $46.00 per month at his job at Graterford. Smith Affidavit ¶ 7, Exhibit 1 to Plaintiff's Memorandum of Law.

■ I had occasion only recently to discuss the development of the eighth amendment's prohibition on cruel and unusual punishment and the proper application of that prohibition to conditions found in state prisons. *See United States ex rel. Hoss v. Cuyler*, 452 F.Supp. 256, 280–86 (E.D.Pa.1978). I need not retrace those steps here, for it is readily apparent that, at least under the traditional eighth amendment analysis, the payment to inmates of very low wages does not amount to cruel and unusual punishment.[3] The wage scale

---

plaintiff and two witnesses, the statements it contains were never sworn to before a public notary or other authorized official, and it is therefore not a proper affidavit under Rule 56(e). *See, e. g., Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 n.17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Oglesby v. Terminal Transp. Co.*, 543 F.2d 1111 (5th Cir. 1976) (per curiam); *Proctor v. Sagamore Big Game Club*, 265 F.2d 196, 198–99 (3d Cir.), *cert. denied*, 361 U.S. 831, 80 S.Ct. 81, 4 L.Ed.2d 73 (1959). Moreover, I am not persuaded by the argument, advanced in letters from plaintiff and his counsel, that the difficulties experienced by plaintiff in his efforts to secure notary services at Graterford justify dispensing with the customary procedures and treating his statement as if it were properly sworn to. Nevertheless, I shall draw on portions of plaintiff's unsworn statement in recounting the factual context in which his free exercise claim arises, and I shall cite to the unsworn statement as though it were an affidavit. Two considerations support this limited use of an unsworn statement: (1) With one exception, *see* note 5 *infra*, defendants dispute none of plaintiff's factual assertions, and (2) all of plaintiff's assertions apparently deal with matters that are within his personal knowledge. Although I will, therefore, make limited use of plaintiff's unsworn statement in summarizing the undisputed facts of this case, matters otherwise stand just as if plaintiff had chosen to rest on the allegations of his pleadings. Thus, if defendants submit a countervailing affidavit with respect to any fact asserted in plaintiff's unsworn statement, I

would then be bound to ignore plaintiff's statement entirely. *See* cases cited *supra*.

2. Defendants have submitted a copy of the unpublished regulations governing the inmate compensation system. This copy appears in the record as an attachment to the Brierley affidavit, which is designated as Exhibit A to defendants' memorandum in support of their motion. Throughout this opinion, citations to particular sections of the regulations will be styled: ICS § x.

3. Indeed, it might be thought that the payment of wages to inmates does not constitute "punishment" at all. However, the eighth amendment's prohibition of cruel and unusual punishment "applies to any acts committed while a person is undergoing punishment for a crime, even though those specific acts may not be committed for punitive purposes." *United States ex rel. Hoss v. Cuyler, supra*, 452 F.Supp. at 285 n. 12 (citations omitted). I therefore must consider whether the complained-of actions here transgressed that prohibition.

Several recent decisions have found in the eighth amendment a requirement that all "punishment" be rationally related to the attainment of specific, articulated penological purposes. *E. g., Imprisoned Citizens Union v. Shapp*, 451 F.Supp. 893, 985–96 (E.D.Pa.1978) (Lord, Ch. J.) (citing cases). The First Circuit, on the other hand, recently rejected this formu-

established by the inmate compensation system involves neither the wanton infliction of physical pain nor the imposition of a punishment incompatible with evolving societal standards of decency. *See generally Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Nor can it be said that the payment of very low wages renders the conditions of plaintiff's imprisonment so severe as to make it grossly disproportionate to the crime for which he was incarcerated.

Plaintiff's eighth amendment argument, however, is premised on the view that state prisoners "are entitled to prison conditions that are not counterproductive to their efforts to rehabilitate themselves." Plaintiff's Memorandum of Law (Document No. 13) at 9 (citation omitted). Starting from this assumption, plaintiff argues that the payment of very low wages to inmates frustrates their efforts at rehabilitation in two ways. First, inmates tend to perceive the disparity between their prison wages and the prevailing wages outside of prison as demeaning and unfair, and so their attitudes toward society at large may be soured. Second, inmates' families may be "forced" onto the welfare rolls by the limited earning power of their incarcerated breadwinners, and this may lead to their prolonged dependence on the state even after the breadwinner is released. Therefore, plaintiff reasons, because the very low wage scale is detrimental to inmates' efforts at self-rehabilitation, the eighth amendment bars the use of that wage scale.

■ Although the payment of very low wages may indeed tend to frustrate rehabilitation, I nevertheless find no constitutional violation here, for I cannot accept plaintiff's premise. The eighth amendment simply does not require that each and every potential obstacle to rehabilitation be eradicated from state prisons. *Cf. Hutto v. Finney,* —— U.S. ——, —— n. 8, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) ("the

Constitution does not require that every aspect of prison discipline serve a rehabilitative purpose").

This conclusion is in accord with the great bulk of reported decisions on this issue. As I pointed out in *United States ex rel. Hoss v. Cuyler, supra,* "[c]ourts have generally rejected cruel and unusual punishment claims based on [the] inadequacy of rehabilitative services." 452 F.Supp. at 283 (citations omitted).

I recognize that several recent district court decisions, including one in the Third Circuit, have embraced the constitutional "right" that plaintiff advances here. *See, e. g., Laaman v. Helgemoe,* 437 F.Supp. 269, 316–22 (D.N.H.1977); *Barnes v. Government of Virgin Islands,* 415 F.Supp. 1218, 1226–27 (D.V.I.1976); *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *modified in pertinent part sub nom. Newman v. Alabama,* 559 F.2d 283, 287 (5th Cir. 1977) (failure to provide opportunities for inmate rehabilitation "does not by itself constitute cruel and unusual punishment"). In particular, plaintiff relies on Judge Bownes' extensive opinion in *Laaman v. Helgemoe, supra.* However, as I read this line of cases, and as *Laaman* itself suggests, this new branch of eighth amendment analysis stops short of an absolute prohibition on prison facilities or conditions that are not conducive to rehabilitation. Rather, the cases seem to contemplate an assessment of (1) the extent to which the prison environment threatens inmates with physical or mental deterioration, and (2) the extent to which prison programs or facilities affirmatively offer inmates any opportunities for physical or mental rehabilitation. *See, e. g., Laaman v. Helgemoe, supra,* 437 F.Supp. at 316–17. The leading cases that found eighth amendment violations were based on findings that the prison environment threatened inmates with physical or mental deterioration, and that this danger was not significantly offset by available opportuni-

---

lation after a careful analysis of the reported decisions. *Nadeau v. Helgemoe,* 561 F.2d 411, 413–17 (1st Cir. 1977). I need not pass on the soundness of this test, for plaintiff bases his

eighth amendment argument solely on the right-to-rehabilitation issue, which is addressed in the text.

ties for rehabilitation. *See, e. g., Pugh v. Locke, supra*; *Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970), *aff'd,* 442 F.2d 304 (8th Cir. 1971).

I may assume for present purposes only that this relatively undeveloped line of eighth amendment analysis is sound, for, even under this analysis, plaintiff has not made a showing sufficient to withstand this motion for summary judgment. Nothing in the record even suggests that the overall environment at Graterford threatens plaintiff with serious physical or mental deterioration. Under the circumstances, I cannot say that the eighth amendment has been violated simply because one aspect of life at Graterford—the very low inmate wage scale—may lessen plaintiff's potential for rehabilitation. Indeed, to accept plaintiff's argument here would be tantamount to holding that rehabilitation is a constitutionally compelled aspect of incarceration, rather than simply a social desideratum that the state may choose to foster. *Cf., e. g., Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) ("since most offenders will eventually return to society, [a] paramount objective of the corrections system is the rehabilitation of those committed to its custody"). Plaintiff has presented no argument that would support such a radical reinterpretation of the prohibition on cruel and unusual punishment. *Cf. Hutto v. Finney,* —— U.S. ——, —— n. 8, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) ("the Constitution does not require that every aspect of prison discipline serve a rehabilitative purpose").

Inasmuch as no factual issues remain and defendants are entitled to judgment as a matter of law, I will enter summary judgment in their favor on plaintiff's claim of cruel and unusual punishment. Plaintiff asserts this claim under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985 (1970), and directly under the eighth (and fourteenth) amendments. I see no material differences among these various theories of liability that might call for different treatment on the present motion. Accordingly, summary judgment will be entered on both the statutory and the constitutional aspects of plaintiff's claim.

### FREE EXERCISE OF RELIGION

[6] Plaintiff contends here that the inmate compensation system, as administered at Graterford, impermissibly infringes his first amendment right to the free exercise of his religion. This argument implicates section 10 of the regulations governing the system, as well as certain procedures employed by Graterford officials in administering that system.

Plaintiff is a member of the religious sect known as the Black Muslims. Smith Affidavit ¶ 2. The tenets of that religion require that he participate in the celebration of Juma each Friday afternoon. *Id.* ¶¶ 3, 4. Some four hundred other Graterford inmates are also Black Muslims, and many of them celebrate Juma each Friday afternoon at a designated location within the Graterford institution. *Id.* For reasons that will shortly become apparent, however, plaintiff has participated in this religious observance only three or four times since the inmate compensation system took effect on November 1, 1976. *Id.* ¶ 7.

To begin with, plaintiff's scheduled work hours at Graterford are from 7:30 a. m. to 11:15 a. m., and from 1:00 p. m. to 3:45 p. m., Monday through Friday. *Id.* ¶ 5. This schedule is not significantly different from the normal work schedule for most Graterford inmates who are employed within the institution. *Id.* If plaintiff were to absent himself from his job on Friday afternoons for the time during which Juma is celebrated, he would forfeit his wages for the time that he missed. ICS ¶ 10.[4] Moreover, "[t]here is no procedure by which [a Black Muslim] inmate may make up the time he misses while he is attending Juma by work-

---

4. Section 10 of the regulations governing the inmate compensation system provides that "[t]here shall be no pay for time absent from [work] for any reason related to," *inter alia,* "religious meetings and services." ICS ¶ 10. Defendants do not dispute that this regulations applies to plaintiff, nor do they suggest that informal exceptions to the rule are ever made.

ing extra hours." Smith Affidavit ¶ 6. In short, plaintiff cannot celebrate Juma, which is "an important part of his religion," without suffering a significant[5] financial loss. *Id.* ¶ 7.

Plaintiff likens his predicament to that of the Seventh-Day Adventist in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), whom the Supreme Court found eligible for unemployment compensation notwithstanding her refusal to accept any job that required her to work on Saturdays. He contends here that, absent a showing that some compelling state interest justifies these inflexible rules, the free exercise clause requires some accommodation of his religious beliefs. *See generally* Comment, *The Religious Rights of the Incarcerated,* 125 U.Pa.L.Rev. 812, 835–36, 850–70 (1977). Defendants, on the other hand, urge that prison officials may impose reasonable regulations on inmates' religious practices and that, as a matter of law, the policies challenged by plaintiff are reasonable and hence valid. They urge that summary judgment may properly be entered in their favor. In addressing defendants' motion, I must initially determine the legal standard by which prisoners' free exercise claims are to be evaluated.

The law is clear that, at least where prisoners are not involved, the state must show some compelling interest before it may infringe upon an individual's free exercise rights. *See, e. g., McDaniel v. Paty,* 435 U.S. 618, 627–628, nn. 7–8, 98 S.Ct. 1322, 55 L.Ed.2d 593 (plurality opinion) (Brennan, J., concurring) (1978); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner, supra,* 374 U.S. at 406, 83 S.Ct. 1790; L.

Pfeffer, God, Caesar, and the Constitution 35 (1975) ("It is the compelling interest test to which the present Court appears committed."). As the Supreme Court recently stated in *Wisconsin v. Yoder, supra:*

> "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."
>
> 406 U.S. at 215, 92 S.Ct. at 1533, *quoted with approval in McDaniel v. Paty, supra,* 435 U.S. at 628, 98 S.Ct. 1322 (plurality opinion).

With respect to the religious rights of prisoners, however, the law is hardly so clear. As one recent commentator observed:

> "At least seven distinct tests have been applied in the past decade to free exercise claims of prisoners; often, two or more tests have been applied by the same court to different claims. Although this area has been extensively litigated, it is as unsettled as it was ten years ago. . . ."
>
> Comment, *The Religious Rights of the Incarcerated,* 125 U.Pa.L.Rev. 812, 816–17 (1977) (footnotes omitted).

Even a brief survey of the case law in the courts of appeals reveals the extent of this uncertainty. Thus, two circuits have squarely held that only a compelling state interest can justify restrictions on prisoners' free exercise rights,[6] while two other circuits have applied a general "reasonableness" test in scrutinizing prison regulations that impinge upon inmates' religious practices.[7]

---

**5.** Plaintiff asserts that he would lose ten hours' pay each month by celebrating Juma on Friday afternoons. Smith Affidavit ¶ 7. Defendants suggested at oral argument that plaintiff has overstated the amount of time actually involved, but they have submitted no affidavits in support of their position. In light of this gap in the factual record, *see* note 1 *supra,* the resolution of this issue must await further proceedings in this case.

**6.** *See Kennedy v. Meacham,* 540 F.2d 1057, 1061 (10th Cir. 1976) (remanding for district court determination "whether any incidental burden on fundamental First Amendment rights is justified by a compelling state interest in the regulation of prison affairs"); *Barnett v. Rodgers,* 133 U.S.App.D.C. 296, 300–301, 410 F.2d 995, 999–1000 (1969).

**7.** *See Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 863 (4th Cir. 1975) (en banc); *Sharp v. Sigler,* 408 F.2d 966, 971 (8th Cir. 1969) (Blackmun, J.).

The Court of Appeals for the Third Circuit has addressed this issue in a number of panel opinions. *See O'Malley v. Brierley,* 477 F.2d 785 (3d Cir. 1973); *Wilson v. Prasse,* 463 F.2d 109 (3d Cir. 1972); *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir. 1971); *Gittlemacker v. Prasse,* 428 F.2d 1 (3d Cir. 1970); *Long v. Parker,* 390 F.2d 816 (3d Cir. 1968). These decisions, taken together, appear at first glance to adopt a broad "reasonableness" standard for resolving prisoners' free exercise claims. *See, e. g., O'Malley v. Brierley, supra,* 477 F.2d at 796; *Wilson v. Prasse, supra,* 463 F.2d at 113–14. On closer examination, however, it becomes apparent that these decisions articulate a test that bears little resemblance indeed to the general "reasonableness" standard with which the law is so familiar. In *O'Malley v. Brierley,* for example, the panel reversed the district court's grant of summary judgment against black inmates who challenged an order barring two priests from visiting the prison to conduct religious services. Judge Aldisert, writing for the panel, noted that summary judgment would have been proper only if, "under the *Long-[G]ittlemacker-Wilson* test of this circuit, the exclusion of [the priests] was, under the circumstances, a reasonable regulation as a matter of law." 477 F.2d at 796. After noting that the record contained factual issues that precluded an entry of summary judgment, Judge Aldisert went on to say:

"Because we are remanding for a trial, we emphasize that the state may not interpose an unreasonable barrier to the free exercise of an inmate's religion. The test for the fact finder, therefore, is simply whether under all of the circumstances, the state has sustained its burden of proof that it was reasonable for the prison authorities to prevent the two priests from engaging in any activities within the prison. In arriving at its 'reasonableness' determination, *the fact finder shall find the regulation to be reasonable only if the alternative chosen (complete exclusion) resulted in the least possible 'regulation' of the constitutional right consistent with the maintenance of prison discipline.* The state authorities are held to the reasonableness test only, and are not required to prove as a condition precedent to the imposition of the regulation that the presence of the priests constituted a 'clear and present danger' to the prison." *Id.* (emphasis supplied, footnote omitted).

Thus, the court of appeals has expressly stated that its formulation of the reasonableness test encompasses the threshold requirement that the challenged prison regulation be the least restrictive alternative available to prison officials.[8] As a result, the test is considerably more demanding than the generalized "reasonableness" standard that has been applied by some courts. *See, e. g., Sharp v. Sigler,* 408 F.2d 966, 971 (8th Cir. 1969) (Blackmun, J.); *United States ex rel. Goings v. Aaron,* 350 F.Supp. 1 (D.Minn.1972). In fact, the requirement that the state select the alternative that infringes least upon personal liberties is more commonly associated with the compelling-state-interest analysis than with the conventional "reasonableness" standard. *See, e. g., Nixon v. Administrator of General Services,* 433 U.S. 425, 467, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Kusper v. Pontikes,* 414 U.S. 51, 58–59, 61, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Sherbert v. Verner, supra,* 374 U.S. at 407, 83 S.Ct. 1790; *Shelton v. Tucker,* 364 U.S. 479, 488–90, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (citing cases); *Barnett v. Rodgers,* 133 U.S.App.D.C. 296, 301, 410 F.2d 995, 1000 (1969).

Plainly, then, the reasonableness test developed in this circuit resembles, in an important respect, the standard applied by other courts under the "compelling interest" label. *Compare O'Malley v. Brierley, supra,* 477 F.2d at 796, *with Barnett v. Rodgers, supra,* 133 U.S.App.D.C. at 301,

---

8. *Teterud v. Burns,* 522 F.2d 357 (8th Cir. 1975), reflects a similar approach. The *Teterud* court expressed it this way: "While deference is accorded the expertise and discretionary authorit[ies] of the correction officials, a regulation which is more restrictive than necessary to meet the institutional objectives or which does not serve the objectives advanced will be struck down." 522 F.2d at 359 (citations omitted).

410 F.2d at 1000. Moreover, in the only reported Third Circuit decision where a prisoner urged that the compelling-interest standard be applied to his free exercise claim, the panel intimated that this standard, were it to be applied, could be applied consistently with the overall reasonableness test articulated in the earlier Third Circuit cases. *See Wilson v. Prasse, supra,* 463 F.2d at 114. Appellant there argued that the district court had erred in instructing the jury to apply a "reasonableness" test in passing on the challenged prison regulations. The proper standard, appellant urged, would have been the compelling-state-interest test. Judge Aldisert, writing for the panel, responded in this way:

> "Accepting, without conceding, the validity of these arguments, it becomes apparent that 'substantial interest' or 'compelling need' are, in the context submitted by appellant, solely standards of law, for use by the court to determine preliminarily before the reasonableness issue is submitted to the jury."

463 F.2d at 114.

Thus, in rejecting appellant's claim that the *jury* should have been instructed to apply the compelling interest standard, Judge Aldisert left open the possibility that the *court* should apply that test as a preliminary matter. The passage quoted above suggests how this approach might work. If the trial judge found that the state's asserted justification amounted to a compelling interest, he would then submit the case to the jury under the Third Circuit's reasonableness test. If, however, the judge determined that no compelling interest supported the challenged regulation, he would then find that the regulation was unreasonable as a matter of law, and hence violative of the free exercise clause.

Not only is the compelling interest requirement entirely consistent with the Third Circuit's approach to prisoner free exercise claims, but much can be said in support of refining that approach by incorporating the compelling interest requirement. One commentator has noted that the principal values protected by the free exercise clause—the individual's need for spiritual self-fulfillment and the societal "respect for the inviolability of conscience"[9] —"exist in the prison community to the same extent that they exist in the society outside of prison." Comment, *The Religious Rights of the Incarcerated,* 125 U.Pa. L.Rev. 812, 851 (1977); *see id.* 852–54. In recognition of this continuity, it would seem entirely appropriate to apply the same analytical framework to prisoners' free exercise claims that is applied to the free exercise claims of nonprisoners. *See id.* 851–52. True, prisons "differ in numerous respects from free society." *Jones v. North Carolina Prisoners' Union, Inc.,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977). These differences must always be taken into account in assessing the reasonableness of a challenged regulation or policy. However,

> "the mere fact that government, as a practical matter, stands a better chance of justifying a curtailment of fundamental liberties where prisoners are involved does not eliminate the need for reasons imperatively justifying the particular retraction of rights challenged at bar."

*Barnett v. Rodgers,* 133 U.S.App.D.C. 296, 302, 410 F.2d 995, 1001 (1969) (footnote omitted).

Whether or not the Third Circuit's reasonableness test is refined in the manner described above, defendants here plainly are not entitled to summary judgment on the present record. The factual record now before me reveals *no* reasons, compelling or otherwise, for defendants' refusal to accommodate plaintiff's religious preference in some fashion. Counsel for defendants asserted at oral argument that it would be infeasible to allow each Black Muslim prisoner at Graterford to make up time lost from work while attending Juma by working at hours outside his usual work sched-

9. Gianella, *Religious Liberty, Nonestablishment, and Doctrinal Development* (pt. 1), 80 Harv.L.Rev. 1381, 1384 (1967).

ule. However, the oral statements by counsel, unsupported by any written submissions, are not part of the factual record on which a motion for summary judgment may be resolved. *See* Fed.R.Civ.P. 56(c) (by implication). None of the written submissions that make up the factual record here shed any light on the reasons underlying defendants' policy. Accordingly, I must deny defendants' motion at this time. If defendants renew their motion and properly establish, by affidavit or otherwise, that it would be infeasible to accommodate prisoners' religious beliefs in the manner suggested here, I will then have to determine (1) whether the compelling interest requirement discussed above should be applied, and (2) if so, whether considerations of administrative convenience amount to a compelling state interest. *See generally* Comment, *The Religious Rights of the Incarcerated*, 125 U.Pa.L.Rev. 812, 859–66 (1977) (proposing a definitional balancing process for determining whether a given interest is compelling in this context). At the present time, however, I need not resolve either of these issues.

Plaintiff's free exercise claim is brought under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985 (1970), and directly under the first (and fourteenth) amendments. I see no reason to treat these various theories of liability any differently at this stage of the case, and I will therefore deny defendants' motion for summary judgment with respect to both the statutory and the constitutional aspects of plaintiff's claim.

### VIOLATION OF 42 U.S.C. § 1981

■ Finally, plaintiff contends that the inmate compensation system is administered in a manner that discriminates against black inmates in favor of white inmates, and that defendants are therefore liable for damages under 42 U.S.C. § 1981

(1970).[10] In essence, plaintiff's claim is that the evaluation forms on which prison supervisors appraise inmates' work are used by the supervisors, who are predominantly white, to give unjustified negative ratings to black inmates. *See generally* ICS §§ 13, 14 (prescribing use of evaluation forms). Defendants, for their part, seek summary judgment on the ground that the factual record lends no support to this contention. Although the record is utterly devoid of evidence in this regard, I will, out of an abundance of caution, withhold decision on defendants' motion at this time. Plaintiff filed this complaint *pro se*, and has been represented by counsel only since April 17, 1978. No discovery has yet been conducted in this case, and plaintiff's counsel has executed an affidavit stating that defendants possess all the evidence that would help to establish plaintiff's claim. Dennis Affidavit, Exhibit 10 to Plaintiff's Memorandum of Law. In order to insure that plaintiff has a full and fair opportunity to discover any evidence bearing on the allegations of racial discrimination, I will defer ruling on defendants' motion for sixty days. If, after sixty days have elapsed, the record still reveals no triable issue of fact bearing on plaintiff's section 1981 claim, I will enter summary judgment in favor of defendants on that claim.

### CONCLUSION

For the reasons stated in the foregoing opinion, defendants are entitled to summary judgment on plaintiff's claim of cruel and unusual punishment. I will deny defendants' motion with respect to plaintiff's free exercise claim, and I will defer for sixty days any ruling on defendants' motion with respect to the section 1981 claim.

---

**10.** Section 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."